Louis V. JACKVONY, Jr.,
Plaintiff, Appellant,

v.

RIHT FINANCIAL CORPORATION,
etc., et al., Defendants, Appellees.

John R. CIOCI, et al.,
Plaintiffs, Appellees,

v.

RIHT FINANCIAL CORPORATION,
etc., et al., Defendants, Appellants.

Nos. 88–1446, 88–1600.

United States Court of Appeals,
First Circuit.

Heard Dec. 6, 1988.

Decided March 30, 1989.

John R. Fornaciari, P.C., with whom Robert M. Disch and Steele & Fornaciari, Washington, D.C., were on brief, for plaintiff, appellant.

Paul B. Galvani with whom Harvey J. Wolkoff and Ropes & Gray, Boston, Mass., were on brief, for defendants, appellees.

Before COFFIN, BREYER and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

In September 1982 the Rhode Island Hospital Trust Bank bought the Columbus National Bank by purchasing its shares. It agreed to give the Columbus shareholders their choice of $25 cash or $25 worth of Hospital Trust stock for each Columbus share (five Hospital Trust shares for six Columbus shares). In November 1983 the Bank of Boston entered into an agreement to acquire Hospital Trust; the final acquisition price was $73 per share. The appellant, Louis Jackvony, was a major Columbus shareholder. He sued Hospital Trust

(and related entities) claiming that Hospital Trust "defrauded" him in 1982 by (1) making certain misleading statements about Hospital Trust, and (2) omitting to disclose certain material facts about Hospital Trust, which misleading statements and important omissions led him to choose (in exchange for his Columbus shares) fewer Hospital Trust shares (and far more cash) than he would otherwise have done. Jackvony added that Hospital Trust again defrauded him in 1983 by omitting to tell him certain important information (about the upcoming Bank of Boston acquisition), an omission that led Jackvony to sell the comparatively few shares of Hospital Trust stock that he owned (and had pledged) at a price lower than what Bank of Boston paid for Hospital Trust shares when the merger was completed. Jackvony claimed that this "fraud" violated the federal securities laws, 15 U.S.C. § 78j(b) (1982); Rule 10b–5, 17 C.F.R. § 240.10b–5, and constituted common law fraud. He made several other, less significant, state law claims.

After Jackvony presented his case to the jury, the defendant moved for a directed verdict. The district court granted the defendant's motion. The court concluded that no reasonable juror could find that Jackvony's evidence showed fraud or any other violation of law. Jackvony appeals. After reviewing the evidence in the record, we conclude that the district court was correct. In our view, the evidence (insofar as counsel specifically and clearly calls our attention to that evidence in his brief) does not show any violation of law, and we do not believe any reasonable juror could find to the contrary. *See Goldstein v. Kelleher*, 728 F.2d 32, 39 (1st Cir.) ("In order to uphold grant of directed verdict we must find that, viewing the evidence in the light most favorable to the non-moving party, reasonable jurors could come but to one conclusion."), *cert. denied*, 469 U.S. 852, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). Consequently, we affirm the district court's judgment.

### I.

#### *The 1982 "Fraud"*

Jackvony rests his 1982 "fraud" claims on (1) the failure of Hospital Trust, during 1980—1982, to disclose various events related to a possible acquisition of Hospital Trust by another corporation ("acquisition-related events"), and (2) Hospital Trust's specific misrepresentation that it would operate Columbus as an "independent entity" after acquiring it. Jackvony says that if Hospital Trust had told him about the "acquisition-related events," he would have exchanged more of his Columbus stock for Hospital Trust stock, rather than for cash; he says that if Hospital Trust had told him the truth about its plans *not* to run Columbus as an independent entity, he would not have sold Hospital Trust his Columbus stock. We shall consider each of these claims in turn.

#### A. *The "Acquisition–Related Events".*

■ The specific facts that Jackvony believes that Hospital Trust should have disclosed, and virtually all the favorable evidence in the 1,000 page record in respect to those facts, consist of the following:

1. In 1980 Hospital Trust's President told the bank's Planning Committee that the bank was "an attractive takeover candidate by a foreign bank."

2. A Hospital Trust Vice President, in late 1980, referred in a memo to Hospital Trust's "growth/restraint, acquire/be acquired, bank/non-bank options."

3. Hospital Trust's President testified that "[t]here had been two or three contacts made to me in a very vague sense of the word ... starting in 1979 of whether we would have any interest in a voluntary way of affiliating with other banks." These contacts, in the President's view, did not amount to "discussions." And, he denied that "these offers of interest [were] of any significance."

4. Hospital Trust's President, at a meeting in April 1981, made some remarks about "being acquired" and "being an acquiror ... both were considerations" for the bank.

5. In September 1981, the bank's Planning Committee was "considering" whether to take some "protective policies against takeovers."

6. Hospital Trust's executive committee's minutes for December 2, 1981, state: "Expressions of interest for affiliation continue from two banks, one in Connecticut and one in Massachusetts."

7. Hospital Trust's president said that Hartford National contacted him about a potential "affiliation" in 1981.

8. Hospital Trust's Planning Committee minutes say that its President referred to it as an "attractive target" for a takeover (Dec. 10, 1981), that its General Counsel had prepared "a position paper" assessing "the realities of any offers seeking to buy" the bank (Jan. 14, 1982), and that he made "a broad review ... of the legal considerations" if the bank "should ... become a takeover target," and made a recommendation about acquiring outside services "relating to mergers and acquisitions" (May 5, 1982).

9. Hospital Trust officials, on various occasions, expressed the view that it had to be a $6 billion bank to survive. (It said so publicly.) Its assets then amounted to about $1.5 billion (presumably a matter of public information). It was having some difficultly raising the capital needed to grow.

In our view, this evidence, taken in the context of this case, could not show any violation of federal Rule 10b–5, or common law fraud. Irrespective of the evidence, Jackvony would not prevail in his Rule 10b–5 claim because Rule 10b–5 prohibits false or misleading statements or omissions only "in connection with the *purchase* or sale of any security." 15 U.S.C. 78j(b); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (emphasis added). Jackvony did not buy or sell Hospital Trust shares in 1982; rather he decided *not* to "buy" (*i.e.,* he decided to turn in his Columbus shares for cash rather than for Hospital Trust stock).

The Supreme Court, in *Blue Chip Stamps,* makes clear that a *potential* purchaser of shares, who decides not to purchase, does not have a Rule 10b–5 claim. *Blue Chip Stamps,* 421 U.S. at 737–38, 95 S.Ct. at 1926–27. Of course, for purposes of Rule 10b–5, a "purchase" includes "any contract ... to purchase." *See* 15 U.S.C. § 78c(a) ("the terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire"); *Blue Chip Stamps,* 421 U.S. at 750–51, 95 S.Ct. at 1932–33; L. Loss, *Fundamentals of Securities Regulations* 800–801 (2d ed. 1988); and Jackvony did enter into a *"contract* to buy" Hospital Trust shares: the Hospital Trust/Columbus merger agreement was itself a "contract" in connection with the purchase or sale or securities. *Marsh v. Armada,* 533 F.2d 978, 981–82 (6th Cir.1976) (exchange of shares in a merger qualifies as purchase or sale under Rule 10b–5), *cert. denied,* 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977); *Knauff v. Utah Construction & Mining Co.,* 408 F.2d 958, 961 (10th Cir.), *cert. denied,* 396 U.S. 831, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969) (same); *Brooks v. Land Drilling Co.,* 564 F.Supp. 1518, 1523 (D.Co. 1983) (same). But, insofar as Jackvony's claim concerns his (or other Columbus shareholders') decision to enter into that basic contract, the failures to disclose of which he complains helped him; they could not have hurt him. That is to say, full disclosure that Hospital Trust might have expected to be acquired could only have made Hospital Trust stock seem *more* valuable, not less valuable, and it could therefore only have led to an agreement that offered Columbus shareholders *fewer* Hospital Trust shares, not more. Jackvony could not have suffered damages in respect to the terms of the Hospital Trust/Columbus merger contract itself.

Jackvony still could have suffered harm in respect to his decision to *exercise* the option the contract gave him. But we are aware of no authority holding that an option holder's *failure* to exercise an option to buy falls within the critical language: "purchase," or "contract to buy, purchase, or otherwise acquire." *Blue Chip Stamps,*

in our view, suggests the contrary. *See Marsh, supra* (shareholders who retained their shares rather than sell or tender them during merger negotiations did not have standing to sue given *Blue Chip Stamps*).

■ We need not decide the *Blue Chip Stamps* point definitively, however, for, when we return to the evidence, we find that Jackvony cannot prevail under either state or federal "anti-fraud" law. He cannot show that Hospital Trust failed to disclose information that was *"material."* The Supreme Court has indicated that the materiality of "information concerning the existence and status of preliminary merger discussions" turns on whether "there is a substantial likelihood that a reasonable" investor "would have considered" it "significant" (by which the court means "important") at the time. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), adopting the standard set forth in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). The evidence that Jackvony presented cannot meet this standard.

For one thing, the evidence shows no more than the type of concern about possible acquisition that many large companies frequently express; it reveals no concrete offers, specific discussions, or anything more than vague expressions of interest. It provides no reason to believe in the existence of any preliminary negotiations of the sort mentioned in *Basic*, a case in which the Supreme Court found that specific "meetings and telephone conversations" among "officers and directors" of the relevant firms "concerning the possibility of a merger" might, or *might not*, prove material, depending upon the "probability that the transaction will be consummated." *Basic,* 108 S.Ct. at 993. Any reasonably sophisticated investor in securities buying shares in a large corporation would expect that, from time to time, other corporations might express an interest in buying, or that the large corporation's directors might discuss what it should do if it obtains such offers. For large corporations to make public announcements every time directors discuss any such matter in terms as vague as those presented in this evidence or receive "tentative feelers" of the general sort revealed by this evidence, *see* pp. 413–14, *supra*, would more likely confuse, than inform, the marketplace.

For another thing, the record contains other evidence making clear that in 1982 the banking community believed that the banking laws would soon change; that previously forbidden interstate bank expansion would soon become permissible; that many regional banks were considering expansion; and that consequently some New England banks might acquire others. Given this general knowledge, the release of the information Jackvony cites, pp. 413–414, *supra*, could have added nothing significant.

Finally, the documents and the full testimony, from which come the excerpts on pp. 413–14, *supra*, confirm that the excerpts had no special significance. That is to say, the full record shows that Hospital Trust placed no *special* significance upon the general and occasional expressions of interest in acquisition that it received from time to time; it shows that Hospital Trust's own thinking about being acquired took place within a context in which it surveyed various general options for the future.

### B. The "Independent Entity" Statement.

■ Jackvony points to another set of statements he claims were materially misleading. He says that Hospital Trust promised to operate Columbus as an "independent entity," either for "five years" after it acquired Columbus, or perhaps "forever." But, he adds, two years after it acquired Columbus, Hospital Trust merged it into the parent company (though it did so for business reasons). Jackvony says that Hospital Trust's statements that it would keep Columbus independent for "five years" or "forever" were misleading, for at the very time it made these statements, in early 1982, before the acquisition, Hospital Trust's executive committee adopted a recommendation to "run" Columbus "as a separate entity over the next several years,"

and *"then merge [it] into "* Hospital Trust (emphasis added).

The fatal difficulty for Jackvony is that we cannot find in the record any significant evidence of a statement, by Hospital Trust officials, that they would operate Columbus independently for five years or more, *upon which Jackvony could reasonably have relied.* At various points during the trial, Jackvony testified that Hospital Trust officials said such things as, for example,

> Columbus would remain a separate entity, independent, that its staff would be maintained for at least five years, that the relationship between the two would be a basis of subsidiaries of Hospital Trust Corporation.

But, subsequent to making any such statements, Hospital Trust and Columbus entered into a written Agreement and Plan of Reorganization. That Agreement (which says that it "constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral ... with respect to the subject matter ... "), mentions nothing about keeping Columbus independent. Hospital Trust also circulated a proxy statement and prospectus, which says,

> No person has been authorized to give any information or make any representation not contained in the accompanying Prospectus/Proxy statement and, if given or made, any such information or representation should not be relied upon.

The proxy statement *does* say that Hospital Trust intends to carry on the "business of" Columbus

> as a subsidiary of [Hospital Trust] ... under the management supervision of [Hospital Trust] ... in the manner similar to the way in which [Hospital Trust] supervises the business operations of its other subsidiaries.

But, the proxy statement does *not* say that it will do so for "five years" or "forever," or that it will do so even if business considerations dictate the contrary.

Insofar as Jackvony argues that Hospital Trust's pre-Agreement statements constitute a contractually binding promise, his argument fails in light of the later written contract, with its explicit statement that it contains the parties' entire bargain. Insofar as Jackvony argues that pre-Agreement statements that Hospital Trust would keep Columbus separate for *five years or more* were materially misleading, his claim fails because in light of the later Agreement and Prospectus, he could not reasonably have relied upon them. *See Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 803–05 (1st Cir.1987) (investors failed to establish justifiable reliance on alleged misrepresentation of broker's employee, where representations were completely at odds with offering memorandum); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518–19 (10th Cir.1983) (buyer's reliance on oral representations as to profitability of venture were unjustifiable in view of information contained in private placement memorandum which would be imputed to the investor). *See also Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 529 (7th Cir.1985) (same).

Indeed in *Kennedy,* we listed the following factors as relevant to deciding whether an investor's reliance was reasonable.

> (1) The sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.

*Kennedy,* 814 F.2d at 804. Any Hospital Trust "independent forever" type statements (as reported by Jackvony) seem to have been vague; Jackvony was a sophisticated investor; the written proxy statement tells Jackvony not to rely upon any such statements; Jackvony (and the other Columbus shareholders) seemed anxious to expedite the transaction (perhaps because of Columbus's shaky financial condition); and Jackvony helped draft the written acquisition documents. These factors militate against any reliance being "reason-

able," to the point where no reasonable juror could have found the contrary. *See also Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 623 (1st Cir.1988); *Zobrist*, 708 F.2d at 1516.

■ Of course Hospital Trust did say in its prospectus that it would operate Columbus as an independent entity. (It made similar statements in other documents.) But those statements are not materially misleading. They do say that Hospital Trust intends to operate Columbus independently, but not *forever or for five years or for any given amount of time or even if business circumstances dictate the contrary*. The only significant evidence to which Jackvony points as indicating that Hospital Trust did not intend to operate Columbus independently is an executive committee memo which states that Hospital Trust will run Columbus as "a separate entity over the next several years, then merge" it into Hospital Trust. This memo, however, foresees at least several years of independent operation; thus, we cannot find, nor do we see how a jury could find, a sufficient contradiction between this document and written statements such as the prospectus as to make of the latter a materially misleading statement.

## II.

### *The 1983 "Fraud"*

■ Although Jackvony took cash for most of his Columbus shares, he nonetheless received about 2,600 Hospital Trust shares in exchange for some of his Columbus stock. He pledged those shares with the Columbus Bank, as collateral for an outstanding loan (to replace Columbus shares previously held as collateral). Jackvony did not repay that loan. Instead, he permitted Columbus, in mid–1983, to obtain a judgment against him, and to liquidate his collateral. He later regretted this decision, for when liquidated, the shares were worth only about $40 each. A few months later, in November 1983, Bank of Boston announced it had reached an agreement to acquire Hospital Trust, paying $59 per share. The merger was finalized in 1985, and Bank of Boston paid $73 per Hospital Trust share. Jackvony says that Hospital Trust "defrauded" him by failing to tell him about various pre-merger events taking place prior to mid–1983 when Jackvony sold his shares. *See Madison Consultants v. Federal Deposit Insurance Corp.*, 710 F.2d 57, 61 (2d Cir.1983) (pledgor of stock sold at direction of pledgee has standing to sue as seller under Rule 10b–5).

The most serious problem with Jackvony's claim is that he points to no "pre-merger events" other than those we discussed in Part I above, see pp. 413–14, *supra*. (At the same time Hospital Trust points to considerable, uncontradicted evidence that, in the deregulatory environment of mid–1983, the informed public was fully aware, as a general matter, that mergers were possible, and that there were no significant "special events," such as offers or specific negotiations with the Bank of Boston, or any of the other factors considered in *Basic v. Levinson*). As we wrote in Part I, the "events" related there were not material in respect to the exchange of Columbus stock in 1982; they were no more material in respect to Jackvony's decision not to redeem his pledged shares. Moreover, in respect to the later "sale," Jackvony brings a 10b–5 action simply as an ordinary, selling member of the public; he did not sell to, or buy from, an "insider," and Hospital Trust had no "duty to disclose" the "pre-merger" information at issue. *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987) (corporation has no affirmative duty to disclose even material information if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosure). *See Basic*, 108 S.Ct. at 987 (silence absent a duty to disclose is not misleading under Rule 10b–5); *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240, 243 (4th Cir.1988) (same); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 1067, 99 L.Ed.2d 229 (1988); *see also* L. Loss, *supra*, at 737.

## III.

### Other Claims

■ A. Jackvony says that the district court erred in excluding testimony by his expert, who wanted to describe in detail (1) that the move toward banking deregulation and permission to branch across state lines led many banks to consider mergers in the early 1980's and (2) that Hospital Trust's need for capital was such that it probably could not expand successfully on its own. The decision whether to admit or to reject expert testimony—the weighing of its potential relevance against its potential for unnecessarily consuming time or confusing the jury—lies primarily in the hands of the district court, not this court. *E.g., United States v. Fosher*, 590 F.2d 381, 382 (1st Cir.1979). Given the fairly obvious, virtually conceded, nature of the expert's first point, and the rather great distance, in terms of relevance, between the second point and the issues in this case, we cannot say that the district court, in refusing to admit the testimony, exceeded its lawful powers. *See Allied International v. International Longshoremen's Association*, 814 F.2d 32, 40 (1st Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 79, 98 L.Ed.2d 41 (1987).

■ B. Jackvony says that Hospital Trust improperly withheld about $3,300 in registration fees for the 2,600 Hospital Trust shares that it gave him (along with considerable cash) in exchange for his Columbus stock in 1982. A document in the record called "stock option agreement," which Jackvony signed, specifically says, however, that

> each seller hereby agrees that it will pay *pro rata* to the extent that it receives [Hospital Trust] .... Common Stock the costs and expenses ... covering the shares of Common Stock of [Hospital Trust] ... to be issued in the merger or pursuant hereto.

In addition, the prospectus says that the selling [Columbus] ... shareholders who executed the stock option agreement have agreed to pay on a *pro rata* basis all costs and expenses ... covering the issuance of the shares of [Hospital Trust] ... Common Stock in the merger. No one denies that the $3,300 fits within this language.

Jackvony argues that the language in the "stock option agreement" does not bind him because Hospital Trust did not exercise the option that it contained. (Hospital Trust evidently obtained the Columbus shares in a different way.) But, the particular clause of the agreement we have quoted does *not* say that the promise it contains binds Jackvony *only if* Hospital Trust exercises the option that the document *elsewhere* describes. To the contrary, the clause specifically says that the shares for which Jackvony must pay the issuing expenses are the shares "to be issued *in the merger or* pursuant hereto." In using the word "or," the clause certainly seems to impose an obligation independent of the exercise of the option; the fact that the prospectus repeats the promise certainly supports its freestanding nature; and Jackvony provided the trial court with no evidence at all to the contrary. (He testified simply that the "stock option agreement says" that the expenses are payable only if "the stock options were used by the bank;" but that is not what the agreement says.) Jackvony also testified that Hospital Trust did not make others pay registration expenses. Of course, this statement was controverted, but it is also beside the point. Jackvony had the burden of proving that he was entitled to the $3,300. He did not do so.

■ C. Jackvony claims that Hospital Trust (in fact, Columbus, which Hospital Trust acquired) owes him about $35,000 in interest that it charged him in respect to loans that he obtained from Columbus in the early 1980's. The very brief portion of relevant testimony on this subject suggests that Jackvony had taken large loans from the Columbus Bank; that he gave that bank someone else's promissory notes for $130,000 as collateral for $130,000 of his loan; that he had discussions in the Fall of 1982 about "the payoff on these [promissory] notes;" that a bank official told him in September 1982 "that he had returned the

notes to the maker and had taken real estate from the maker worth $130,000 in the name of Columbus National Bank;" that Jackvony told the official that "since" the maker had "paid off" the notes, it should deduct $130,000 from "the debt" Jackvony "owed the bank;" and that the bank official "said no," and continued to charge Jackvony interest. Presumably, the bank official viewed the bank's exchange of note for real estate as a simple substitution of collateral, not as a payoff of a loan. Obviously, if collateral was substituted and the loan was not paid off, the bank could continue to charge Jackvony interest. In any event, Jackvony bears the burden of proving that the bank somehow acted improperly, and his brief testimony on the matter, virtually all of which we have quoted, fails to do so.

### IV.

*Attorneys' Fees*

In a cross-appeal, Hospital Trust asks us to require the district court to assess costs and attorneys' fees against Jackvony under Fed.R.Civ.P. 11, or in the alternative, as "costs of collection" under a promissory note that is the subject of state litigation between the parties. The decision about whether to assess Rule 11 sanctions, however, is one primarily for the district court to make, because the "district court 'has tasted the flavor of the litigation and is in the best position to make these determinations.'" *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603 (1st Cir.1988) (citing *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C.Cir.1985)). Although some of Jackvony's claims can be considered somewhat frivolous (those discussed in Part III above), we cannot say the same about his federal claims. And, we therefore cannot say that the law required the district court to impose Rule 11 sanctions, or that the court abused its discretion. *Stevens v. Lawyers Mutual Liability Insurance Co. of N.C.*, 789 F.2d 1056, 1060 (4th Cir.1986).

Similarly, we cannot say that Hospital Trust is entitled to attorneys' fees as part of the collection costs included in the promissory note that is the subject of a state lawsuit. This action by Jackvony was not an integral part of the enforcement and collection of the note, nor was it shown to have been a claim directed to prevent the collection of the note. *Cf. Exchange National Bank v. Daniels*, 763 F.2d 286 (7th Cir.1985) (counterclaims were integral to the enforcement of claim based on note); *Duryea v. Third Northwestern National Bank*, 606 F.2d 823 (8th Cir.1979) (counterclaim brought to prevent collection of loan, and directly related to the collection).

### V.

We have not discussed every piece of evidence in the record. We are satisfied, however, after examining the record in full, and those portions cited by counsel in detail, that there is no evidence not here discussed that could lead to a different legal conclusion.

The judgment of the district court is

*Affirmed.*