MacLeod, J.
The plaintiffs, Jeffrey Nanfelt (“Nanfelt”); Gerald W. Faust (“Faust”); David S. Hungerford (“Hungerford”); Faust Management Corporation Pension Plan for the Benefit of Gerald W. Faust; Thomas M. Zizic (“Zizic”), in his capacity as Trustee of T.Z. Associates Profit Sharing Plan; T.Z. Associates Pension Plan and Thomas M. Zizic Keogh Plan; Thomas Zizic and Martha A. Zizic, in their capacity as general partners of The Zizic Family Limited Partnership; and T.Z. Associates, Inc. (collectively “plaintiffs”), brought this action alleging Fraud/Misrepresentation (Count I), Violation of G.L.c. 110A (Count II), Violation of G.L.c. 93A (Count III), and Breach of Contract (Count IV) against the defendant J erilyn Asher (“Asher”) stemming from a purchase and sale of company stock. This matter is now before the Court on Asher’s motion for summary judgment on all counts. For the reasons set forth below, Asher’s motion for summary judgment is DENIED.
BACKGROUND
In 1995, Physicians Qualily Care, Inc. (“PQC”), was founded.[3] The business of the company was to own, operate, and manage physician practices. Asher[4] and plaintiffs Zizic, Hungerford, and Faust purchased Class A common shares in PQC at its inception in 1995 and remained shareholders at all material times.
*494 In December 1997 and/or January 1998, Asher discussed with the three plaintiffs individually, their purchase of some of her shares of common stock of PQC. During these discussions, Asher allegedly stated that:
1) she needed to pay for substantial medical expenses pertaining to her adult daughter’s care.[5] To both Zizic and Hungerford, she represented that she would be using the proceeds to pay for renovation expenses to her home to make it accessible for her daughter;
2) the PQC Board of Directors (“Board”) approved her sale of her shares for use to pay for her daughter’s medical needs;
3) the Board had established $4.00 as the price for the shares and that she had no choice but to sell the shares at that price;
4) the $4.00 share price was based upon either a completed transaction or a transaction that was agreed to but had not yet closed, but whose closing was imminent;
5) she believed that the $4.00 share price was a bargain due to pending transactions at which the stock would be valued by the Board at a price in excess of $7.00 a share, and an Initial Public Offering (“IPO”) was likely to take place within the next six to twelve months at which time the shares would be valued in excess of $10.00 a share.
At the time of these discussions, the plaintiffs were existing stockholders of PQC and had had substantial dealings with Asher in the past.[6] In fact, the plaintiffs considered her a friend and trusted business associate.
Following these conversations, the plaintiffs agreed to purchase the shares based upon Asher’s representations that (1) she needed the money to pay for her daughter’s medical expenses, and (2) the Board approved the sale based upon her need. In late January and early February 1998, the plaintiffs purchased approximately $600,000.00 worth of PQC shares at $4.00 per share based on Asher’s representations that (1) the Board set the purchase price at $4.00 per share, (2) the $4.00 price was based upon a completed or about to be completed transaction, (3) there were imminent deals in place where the figure was in excess of $7.00 per share, and (4) an IPO was to take place within the next six to twelve months.[7]
By early February 1998, each of the plaintiffs signed a Purchase Agreement (“Agreement”) which expressly stated, in relevant, part:
[N)either Ms. Asher nor PQC has made any representations with respect to registration of the Stock under the Securities Act, that no such registration is contemplated, that there can be no assurance that there will be any market for the Stock in the foreseeable future, and that, as a result, the undersigned must be prepared to bear the economic risk of his investment for an indefinite period of time.
The undersigned has substantial knowledge and experience in making investment decisions of this •type and is capable of evaluating the merits and risks of this investment.
The undersigned has had such access to information regarding PQC as the undersigned has determined to be necessary or appropriate in connection with the transaction contemplated by this Agreement. PQC has made available to the undersigned all documents requested and has provided answers to all of the undersigned’s questions relating to an investment in PQC. In addition, the undersigned has had an opportunity to discuss this investment with representatives of PQC and to ask questions of them.
The undersigned understands that an investment in PQC involves significant risks, and the undersigned has carefully reviewed and is aware of all of the risk factors related to the purchase of shares of Stock.
As of February 6, 1998, the shares were transferred on PQC’s books.
Under a cover later dated March 15, 1998, Asher’s attorney David Phelan sent waiver forms (“Waivers”) to Hungerford, and Zizic, and the institutional investors[8] stating that the purpose for seeking the Waivers was to permit Asher to sell shares to pay for her daughter’s health care costs. Undisputed however, is that the purchase and sale of shares had already been consummated at the time of the March 15, 1998 letter. On March 28, 1998, Asher’s daughter died unexpectedly. The plaintiffs thereafter presumed that the proceeds from the sale of stock were used to pay accumulated expenses.
By April 9, 1998, Hungerford and Zizic had signed the Waivers[9] based upon the continuing representations by Asher that the money was being used to pay for her daughter’s health care costs. These Waivers purported to permit Asher to bypass the restrictions governing her sale of stock under the 1996 Stockholders Agreement.[10]
By May 1998, PQC’s prospects had begun to deteriorate. In June 1998, a memorandum proposing a “Class L” round of financing was circulated to PQC shareholders. The memorandum explained that PQC was facing a shortfall in capital and asked shareholders to approve the issuance of Class L stock at a price of $3.25 a share. Because Class L shares have significant preferences, Class A common stock was worth less than $3.25 a share. On June 22, 1998, the Board determined that the fair market value of Class A common stock was $2.25 a share.
*495 In September 1998, PQC sent all shareholders a notice of annual meeting. This package contained several documents illustrating PQC’s current financial condition.[11] In November 1998, PQC distributed to its affiliated physicians a document describing a new business model and a proposed reorganization to address the financial problems of PQC. On December 17, 1998, the physicians affiliated with PQC elected not to pursue the proposed reorganization, but instead opted to repurchase their practices from PQC.
In late 1999 or early 2000, the plaintiffs learned that Asher did not use the proceeds from the sale to pay for her daughter’s medical expenses or to renovate her home. Further, upon learning this information, the plaintiffs began questioning other representations made to them and learned that the Board never approved Asher’s sale of stock nor had it set a share price of $4.00 a share.
PQC discontinued operations in November 2001. At that time, Class A shares were of no value. On December 17, 2001, the plaintiffs filed their Complaint.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating that there are no triable issues, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
I. Fraud/Misrepresentation (Count I) A. Statute of Limitations
Asher contends that the plaintiffs’ action for breach of contract is barred by the three-year statute of limitations of G.L.c. 260, §12. The basis for this argument is the plaintiffs’ allegations that they were defrauded in transactions that occurred in January and February 1998. Since the plaintiffs filed suit on December 17, 2001, almost four years after the complained of transactions, Asher therefore asserts this claim is time-barred.
The statute of limitations begins to run when the action accrues. However, the “discovery rule” tolls the statute of limitations where; (1) a misrepresentation concerns a fact that was “inherently unknowable” to the injured party; (2) the wrongdoer breached some fiduciary duty of disclosure; or (3) a wrongdoer concealed the existence of a cause of action through some affirmative act done with the intent to deceive. Patsos v. First Albany Corp., 433 Mass. 323 (2001). In these circumstances, the statute of limitations is tolled until such time when the plaintiffs knew or should have known of the cause of action. Riley v. Presnell, 409 Mass. 239, 244 (1991).
The plaintiffs contend that they purchased Asher’s stock because she was in need of money to care for her daughter and because Asher represented that the Board approved the sale of the stock and had affixed a value of the stock based upon PQC’s last transaction at $4.00 a share. Moreover, the plaintiffs contend they relied on Asher’s representations that PQC would likely go public within a year when they agreed to purchase a portion of her shares. The plaintiffs argue that Asher never intended to use the money to care for her daughter, the Board never approved the sale of the stock or affixed a value to it, and, prior to the sale, PQC never had a transaction where its stock was valued at $4.00. Thus, the basis of the plaintiffs’ claim is that not only did Asher fraudulently conceal the facts giving rise to their tort claims, but also Asher breached her duty as a fiduciary to disclose this information to them.
Asher argues that prior to December 1998, the plaintiffs were well aware of PQC’s financial problems. Asher relies on the following to support this argument; (1) PQC’s 1998 filings made no mention of an acquisition of Morgan Health — the alleged transaction where PQC’s stock was valuated at $4.00 a share; (2) in June 1998, “all PQC shareholders, including the plaintiffs, were informed by PQC that the company was experiencing significant financial difficulties and planned to enter a ‘Class L’ round of financing to raise money— Class L stock would have preference over Class A; and (3) the September 23, 1998, shareholder meeting materials valued Class common stock at $2.25 a share. Asher contends that even if the representations constitute fraud or misrepresentation, the plaintiffs had the means to acquire the facts necessary to negate the tolling of the statute of limitations based on fraud or misrepresentation. Therefore, the claim is untimely.
Alternatively, the plaintiffs argue that Asher, as C.E.O. and President of PQC, was in a fiduciary relationship with them. Where there is a fiduciary duty to disclose the facts and a failure to do so, the fact that the plaintiffs had the means of learning the facts would not preclude the tolling of the statute until such time as the plaintiffs acquired actual knowledge of the facts. Demoulas v. Demoulas Super Mkts., Inc., 424 Mass. 501, 519-20 (1997).
At issue is whether the parties’ relationship was a fiduciary one or whatever it amounted to no more than an arm’s length business relationship. Here, the outcome is dependant on the resolution of disputed issues of material fact, such as whether the parties’ relation *496 ship was one of trust and confidence; whether the plaintiffs relied upon Asher’s specialized knowledge; whether Asher was aware of the plaintiffs’ reliance upon her; and whether Asher abused the plaintiffs’ trust and confidence to the plaintiffs’ disadvantage. It is a question for the jury to determine whether there was a relation of trust and confidence; whether the plaintiffs relied upon Asher’s representations and knowledge; whether Asher was aware of the plaintiffs’ reliance; and whether Asher abused that trust and confidence. Hayes v. Moulton, 194 Mass. 157, 165 (1907).
The plaintiffs have submitted evidence that, for those causes of action that involved wrongdoing occurring more than three years prior to the commencement of the action, the statute of limitations was tolled by Asher’s failure to fully disclose material facts, known to her, on which this claim is based. Specifically, the plaintiffs were unaware of such critical facts as, at the time of the sale, Asher: (1) had no intention of using the proceeds from the stock sale to pay for her daughter’s heath care or to renovate her house; (2) knew that the Board had not approved the sale of her shares; (3) knew the Board had not established a share price or even set one at $4.00 a share; (4) knew that no transaction was expected to close imminently or had already closed with a $4.00 a share; and (5) knew an IPO was unlikely.
The record evidences plaintiffs’ considerable dealings with Asher in the past, as well as testimony that they considered her a friend. In addition, there are allegations that Asher made statements that the Board had approved the sale because of the circumstances with her daughter. The duiy of honest advice and full disclosure arises where one party reposes confidence in the integrity of another and the other party voluntarily assumes and accepts the confidence. Reed v. A.E. Little Co., 256 Mass. 442, 448-49 (1926). When confidence is reposed and accepted, the person trusted is liable for expressing dishonest opinions upon which the other party relies and acts to his detriment, and she is also liable for concealing facts which by reason of the relationship she should disclose. Id. at 449.
The broad principle on which the court acts in cases of this description is that, wherever there exists such a confidence, of whatever character that confidence may be, as enables the person in whom confidence or trust is reposed, to exert influence over the person trusting him, the court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of eveiy particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.
Id. Asher’s own testimony evidences that the sale proceeds were never used to defer her daughter’s medical costs; nor had she, at the time of the sale, intended to renovate her home for the benefit of her daughter. It is undisputed that the sale proceeds were reinvested in her own investment portfolio.
Based on the fiduciary relationship that existed between Asher, as a corporate director, and the plaintiffs, as shareholders, the statute of limitations may be tolled for claims arising from undisclosed, concealed, and misrepresented facts. Demoulas, 424 Mass. at 522. Here, the plaintiffs have introduced evidence which tends to demonstrate that they had no actual knowledge of the cause of action prior to late 1999 or early 2000. In order for Asher to prevail on summary judgment, therefore, she must show that there is no genuine dispute as to whether the plaintiffs were aware of the facts that constitute their cause of action prior to December 17, 1998. The objective standard of reasonableness does not displace the actual knowledge standard that has been applied to violations of fiduciary duly that constitute fraudulent concealment or to conduct involving a repudiation of trust. Id. at 520-21. Massachusetts law shows no reluctance in allowing a jury to decide factual issues relative to the statute of limitations. Riley, 409 Mass. at 248.
This Court finds such information to contain a genuine issue of material fact as to when the plaintiffs knew or should have known that they might have been harmed by Asher’s wrongful conduct. In light thereof, the tort claims cannot be disposed of by summary judgment on the statute of limitations ground.
B. Purchase Agreement
Asher next contends that even if such representations were made, the plaintiffs signed Agreements that acknowledged that
neither Ms. Asher nor PQC has made representations with respect to registration of the Stock under the Securities Act, that no such registration is contemplated, that there can be no assurance that there will be any market for the Stock in the foreseeable future, and that, as a result, the undersigned must be prepared to bear the economic risk of his investment for an indefinite period of time.[12]
Therefore, the plaintiffs are bound by the Agreement through which they had, in effect, agreed to take all risks, whether they were defrauded or not.
“It is fundamental that contracts in writing voluntarily executed with full knowledge of their contents by rational beings acting on their own judgment must be enforced.” Bates v. Southgate, 308 Mass. 170, 174 (1941). However,
[i]t is a fundamental principle of law, as it is of morals, public policy and fair dealing, that a party cannot contract against liability for his own fraud. Fraud which enters into the making of the contract cannot be excluded from the reach of the law by any form of phrase inserted in the contract itself. Parties cannot by written works prevent the law from in *497 quiring into and granting relief for fraud in the substance of the contract.
Id. at 177. Moreover,
[m]any contracts have been refused enforcement whereby a party has striven to shield himself from the results of his fraudulent practices upon the other party. Such contracts, if given validity, would overcome the salutary maxim which pervades the common law, that fraud vitiates every transaction at the election of the injured party.
Id. Thus, the terms of a contract cannot be invoked to prevent this Court from examining all the circumstances to determine, whether the contract should be enforced. “No one can escape the equitable consequences of his fraudulent statements inducing a contract by inserting therein a clause [that limits liability].” Id.
In Noack v. Standard Stores, Inc., the plaintiff had been induced to buy stock-from the defendant by fraudulent representations and false statements. 281 Mass. 53, 55 (1932) The contracts of purchase provided that, “No condition, agreements or representations, written or verbal, other than those printed herein, shall be binding.” Id. The court held that deliberate fraud with respect to the contract itself entitled the plaintiff to relief, notwithstanding the recital in the contract relied on by the defendant. Id. at 56.
In deference to the demands of a larger public policy, the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it. Bates, 308 Mass. at 182. The following passage best states this rationale:
In the realm of fact it is entirely possible for a party knowingly to agree that no representations have been made to him, while at the same time believing and relying upon representations which in fact have been made and in fact are false but for which he would not have made the agreement. To deny this possibility is to ignore the frequent instances in everyday experience where parties accept, often without critical examination, and act upon agreements containing somewhere within their four corners exculpatory clauses in one form or another, but where they do so, nevertheless in reliance upon the honesty of supposed friends, ... or the customary course of business. To refuse relief would [sic] result in opening the door to a multitude of frauds and in thwarting the general policy of the law.
Id. The law bans all attempts to secure total or partial immunity from liability for fraud under the form of contract. Id.
Therefore, there exists a question of fact as to whether Asher induced the plaintiffs by fraud and misrepresentation. For the foregoing reasons, Asher’s motion for summary judgment as to Count I is denied.
II. Violation of M.G.L.c. 110A, §410— Uniform Securities Act (Count II)
The Massachusetts Securities Act states, in relevant part:
(a) Any person who ... (2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him . . .
G.L.c. 110A, §410.
To prevail on a Massachusetts securities law claim, the plaintiffs must demonstrate that a sale of a security was effected through a material misstatement or omission and that the defendant was, at least, negligent with respect to the misstatement or omission. In re Choinski, 214 B.R. 515, 523 (1st Cir. 1997). The plaintiff may prevail only if he or she “did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.” G.L.c. 110A, §410(a)(2). See Jackvony v. RIHT Fin. Corp., 873 F.2d 411, 416 (1st Cir. 1989).
A. Whether Plaintiffs Knew or Should Have Known of the Untruth of Asher’s Alleged Misrepresentations
For the reasons as set forth in Section I, A, above, Asher argues that the plaintiffs knew or should have known of her alleged misrepresentations. First, Asher argues that the plaintiffs should have known that PQC would not go public relatively quickly based upon the Agreement’s language stating “that no such registration is contemplated.” This Court does not agree. While IPOs are somewhat speculative, one cannot be allowed to pique a party’s interest by stating an IPO “was likely to take place within the next six to twelve months at which time the shares would be valued in excess of $10.00 a share,” with the knowledge that such statements, admittedly, were untrue. As C.E.O. and President of PQC, Asher was in a position of trust with shareholders. Statements from a high level executive, while not given the conclusiveness of truthfulness, should not simply be dismissed by an ambiguous provision that “no such registration is contemplated” at the time of contract.
Second, Asher argues that her daughter’s death should have alerted them that the money was not needed for medical costs or home renovation. This Court finds this conclusion unsupported for two reasons: (1) the sale had already taken place by the time Asher’s daughter died,[13] and (2) it is not uncommon for medical costs to be substantial upon completion of treatment or death, as could have been the case here.
*498 Lastly, Asher contends that the plaintiffs could have called PQC’s management to verify the right of sale and the sale price. This Court finds the issue of whether the plaintiffs should have or could have verified information is a question of fact to be determined by the jury.
Asher allegedly represented to the plaintiffs that the stock was being sold out of necessity to care for her daughter. This information is unrelated to PQC’s performance, and the information dispersed[14] would not have caused the plaintiffs to realize that the statements allegedly made, prior to the time of purchase, were fraudulent or misleading.
B. Whether Plaintiffs’ Reliance Was Reasonable
Asher also argues that the plaintiffs could not have reasonably relied on her representations as to the purchase of the stock. In determining whether an investor’s reliance was reasonable, one must consider the following:
(1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations.
Jackvony, 873 F.2d at 416-17. The question of whether a parly’s reliance is reasonable is usually a fact question. Cataldo Ambulance Serv., Inc. v. Chelsea, 426 Mass. 382, 387 (1998). Here, the record indicates the parties had a long-standing business and personal relationship, the plaintiffs reposed their trust in Asher, and there existed a fiduciary relationship between Asher and the plaintiffs. Moreover, it is alleged that Asher claimed to be in dire financial straights because of her daughter’s care and that the sale of stock was to be used for that reason, an alleged misrepresentation, if proven true, which was virtually undetectable. In addition, Asher never, prior to the time of sale, informed the plaintiffs that she was not responsible for her daughter’s care or that she did not intend to renovate her home; nor was this information readily detectable by the plaintiffs.
Asher has failed to carry the burden of affirmatively demonstrating the absence of a triable issue. Therefore, Asher’s motion for summary judgment as to Count II is denied.
III. Violation of G.L.c. 93A, §9— Consumer Protection (Count III)
The consumer protection statute states, in relevant part:
Any person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person’s use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder . . . may bring an action in superior court . . . whether by way of original complaint, counterclaim, cross-claim or third parly action, for damages and such equitable relief including an injunction, as the court deems to be necessary and proper.
M.G.L.c. 93A, §9(1). Section 2 makes illegal “any unfair method of competition or unfair or deceptive acts or practices in the conduct of trade or commerce.” These acts or practices can include violations of the Securities Act. Gerzof v. Cignal Global Communications, Civil No. 00-3337 (Middlesex Super.Ct., Aug. 13, 2001) (Brassard, J.), 13 Mass. L. Rptr. 429.
Asher argues that the plaintiffs’ 93A claim is futile because the transaction did not involve (1) trade or commerce, or (2) a public dispute. According to G.L.c. 93A, trade and commerce includes “[t]he offering for sale, . . . tangible or intangible, real, personal or mixed, any security... and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.” G.L.c. 93A, §1.
A. Whether Sale Occurred in Trade or Commerce
This Court must consider whether this transaction occurred in trade or commerce. The general test of whether a defendant’s acts fit the statutory definition of trade or commerce is whether the alleged acts were perpetrated within a “business context” versus a “private, nonprofessional basis.” Lantner v. Carson, 374 Mass. 606, 610-11 (1978). The question of whether a private individual’s participation in an isolated transaction takes place in a business context must be determined from the circumstances of each case. Belgelfer v. Najarian, 381 Mass. 177, 190-91 (1980).
In Belgelfer, the defendants alleged to have violated 93A were pharmacists who were among several groups that lent varying sums of money to the principals in a large real estate transaction. Id. at 180. The defendants’ participation was as private individuals making an isolated financial investment, and they had no role in arranging the underlying real estate transaction. Id. It was held that their lending activity did not take place in a business context. Id. at 191.
To establish a private person’s liability, the court should assess the nature of the transaction, the character of the parties involved, and the activities engaged in by the parties. Id. Other relevant factors are whether similar transactions have been undertaken in the past, whether the transaction is motivated by business or personal reasons, and whether the participant played an active part in the transaction. Id. The commercial transaction need not have taken place only in the ordinary course of a person’s business or occupation before its participants may be subject to liability under G.L.c. 93A. Id.
*499 Furthermore, it is the defendant’s — not necessarily the plaintiffs’ — motivation for the transaction that should guide the court’s assessment of whether the acts complained of were committed within a business context. See, e.g. Planned Parenthood Fed’n of Am., Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 493-93 (1986). In this regard, G.L.c. 93A unques-tionably imposes liability on those who seek to gain financially from their unfair practices. Poznik v. Massachusetts Med. Prof'l Ins. Ass’n, 417 Mass. 48, 53 (1994).
In this case, application of the stated factors suggests that the transaction is more susceptible to being characterized as occurring in a “business context.” The sale of business assets, shares, is not the same as the sale of a home by an individual owner,[15] and in this case, Asher was fully involved in eveiy aspect of the transaction,[16] including the false representation which is the core of the alleged G.L.c. 93A violation.
The plaintiffs allege that Asher deliberately misled them with specific misrepresentations, seeking to profit from this intentional fraud as the sale proceeds were reinvested in her own portfolio. Additionally, it is alleged that Asher was not motivated by her desire to pay for the medical costs of her daughter, but rather, that she knowingly misrepresented material facts in order to profit from the sale of the stock. Lastly, it is undisputed that Asher was engaged in the investing in and forming of companies, a practice which she carried on for profit.
The record evidences that Asher sold over one million dollars worth of PQC stock to twelve persons and corporations, in addition to the plaintiffs, most of whom she did not know and many of whom were not preexisting shareholders of PQC. In addition, Asher’s own attorney prepared a memorandum advising her to take precautions to avoid the sales from being construed as public sales and subject to SEC regulation.[17] Instead, Asher apparently disregarded her attorney’s advice and sold shares to companies and individuals whom she did not know or who were already PQC shareholders. Furthermore, upon sale of the stock, Asher used the proceeds to add to her investment portfolio.
In sum, the plaintiffs’ allegations present a cognizable claim that Asher was engaged in trade or commerce, and that her motivation was, at least in part, if not wholly, economic, as opposed to being strictly personal. In fact, Asher herself considered the sale of her stock to be a business transaction.[18] Given these allegations, this Court cannot conclude that there is no set of facts upon which the plaintiffs could establish a claim for unfair or deceptive practices pursuant to G.L.c. 93A, §9.
B. Whether Sale Has Public Aspects
The plaintiffs have stated that they relied on Asher’s representations and that, had it not been for those representations, they never would have purchased the stock. Thus, Asher’s representations are at the heart of and the reason for the transaction. Moreover, the record indicates that Asher initiated contact and garnered interest based upon those same misrepresentations. Asher, the C.E.O. and President of PQC, solicited the plaintiffs and many other individuals and companies located throughout the United States to purchase her stock.[19]
While these questions maybe close, their resolution is doubtless largely fact-driven. For these reasons, Asher has failed to establish the absence of a genuine issue as to any material fact as to plaintiffs’ claims for violation of G.L.c. 93A. Therefore, Asher’s motion for summary judgment as to Count III is denied.
IV. Breach of Contract (Count IV)
Asher argues that the waiver signed by the plaintiffs validating her sale of the stock is dispositive of the plaintiffs’ breach of contract claim. Conversely, the plaintiffs claim that Asher did not comply with the transfer restrictions of the 1996 Stockholders Agreement and that the waiver signed after the sale was procured by fraud.
As stated earlier, the plaintiffs argue that they would never have signed the waiver if it had not been for Asher’s misrepresentations. As in Section I, B, above, “(i]t is fundamental that contracts in writing voluntarily executed with full knowledge of their contents by rational beings acting on their own judgment must be enforced.” Bates, 308 Mass. at 174. However,
(i]t is a fundamental principle of law, as it is of morals, public policy and fair dealing, that a party cannot contract against liability for his own fraud. Fraud which enters into the making of the contract cannot be excluded from the reach of the law by any form of phrase inserted in the contract itself. Parties cannot by written works prevent the law from inquiring into and granting relief for fraud in the substance of the contract.
Id. at 177. Moreover,
[m]any contracts have been refused enforcement whereby a party has striven to shield himself from the results of his fraudulent practices upon the other party. Such contracts, if given validity, would overcome the salutary maxim which pervades the common law, that fraud vitiates every transaction at the election of the injured party.
Id. Thus, the waiver cannot be invoked to prevent this Court from examining all the circumstances to determine whether the waiver should be enforced. “No one can escape the equitable consequences of his fraudulent statements inducing a contract by inserting therein a clause [that limits liability].” Id.
According to the Stockholders Agreement,
[n]o holder of Management Shares or Physician Shares shall Transfer any of such Shares to any *500 other Person, except as permitted by Sections 4.1,4.2, 7 and 9.1, as permitted or required by Section 5 or as required by Section 6. Any attempted Transfer of Management Shares or Physician Shares not so permitted or required by such Sections shall be null and void, and the Company shall not in any way give effect to any such impermissible Transfer. ¶4.
[t]he term “Fair Market Value” shall mean, as of any date, the fair value of any Share as of the applicable date on the basis of a sale of such Share in an arms length private sale between a willing buyer and a willing seller, neither acting under compulsion, . . . as determined by the Board . . . 115.5.
“No holder or holders of Shares . . . shall Transfer . . . any Shares to any other Person . . . except in the manner and on the terms set forth in this Section 7 and attempted Transfers in violation of this Section 7 shall be null and void.
7.1.1. Offer. A written notice . . . shall be furnished by the Proposed Seller to each holder of Shares ... at least 30 days prior to a Transfer.
Stockholders Agreement ¶7 (emphasis added).
The record evidences that the plaintiffs, as well as outside investors, executed the waiver based on Asher’s representations made that the proceeds were needed to pay for her daughter’s medical expenses. In addition, the March 15, 1998, letter sent by Asher’s attorney to the investors was for the purposes of securing their waiver and stated that “Asher has obtained approval from the institutional investors in Physicians Quality Care, Inc. to sell a limited amount of her shares in the Company to help pay for her daughter’s health care coverage and other living expenses.” By her own admission, Asher, at this time, had no plans to either use the money to pay for medical costs or to renovate her home. Furthermore, Asher’s testimony is that she did not need Board approval to sell her stock, that her informing the Board of her intent to sell was more a “disclosure” than request for approval and that the Board never approved a $4.00 value to Asher’s stock.
Moreover, the waiver was executed after the transaction had been completed. The plaintiffs had paid in full and the stocks had already been transferred on the company books.[20] The waiver was therefore unnecessary for the transaction to be complete. Arguably, the waiver was issued in an attempt to remedy a breach of the transfer restrictions set forth in the 1996 Stockholders Agreement.
Thus, Asher has failed to affirmatively demonstrate the absence of a triable issue. Therefore, Asher’s motion for summary judgment as to Count IV is denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that defendant Asher’s motion for summary judgment as to Counts I, II, III, and IV be, and hereby is, DENIED.

The Court is considering the facts in the light most favorable to the non-moving party, as presented by the pleadings, affidavits, and stipulated facts, and as revealed by the summary judgment record.

Chief Executive Officer (“C.E.O.”) and President of PQC.

Asher’s daughter was born paralyzed with spina bifida and hydrocephalitis.

Prior to this transaction, the plaintiffs successfully invested in Asher’s previous business, Protocare, and both Faust and Zizic have served as paid consultants to PQC since its inception. Moreover, Zizic had sold his medical practice to PQC and practiced medicine with a PQC affiliate.

In January 1998, Zizic purchased 89,650 shares totaling $358,000.00; on January 29, 1998, Hungerford purchased 50,000 shares totaling $200,000.00; and on January 27, 1998, and February 16, 1998, Faust purchased a total of 15,625 shares totaling $62,500.00.

In addition to the plaintiffs and other initial investors, several venture capital companies, including Bain Capital, were also PQC stockholders.

Faust never signed the Waiver.

The Stockholders Agreement provided, in relevant part, that: “any transfer effected outside the requirements of sections 4.1, 4.2, 7, 9.1, as permitted or required by Section 5 or required by Section 6, shall be null and voided and the Company shall not in any way give effect to any such impermissible transfer.” The specific language is discussed below.

Included in the package was a Form 10-Q filed with the Securities and Exchange Commission for the period ending June 30, 1998, documentation that Class A shares had been valued at $2.25 a share.

Agreement, ¶6.

From the time of sale until Asher’s daughter’s death, the only outstanding issue was the signing of the “Waiver,” which arguably was unnecessary as the sale and transfer of stock had already been completed.

As outlined in section I, A, above.

As in Lantner.

Unlike the defendants in Beigelfer.

Specifically, the memorandum stated that “as few persons should be contacted regarding the sale as possible];]” “if you have non-public information that would be material to an investor];]” and “we should make sure that the Board/institutional investors’ approval of your sale is adequately documented before you are committed to any sale.”

Deposition of Asher, Vol. I, pp. 208, 226; Vol. II, pp. 75-76, 83-84, 174.

Twelve of these individuals and/or companies had never previously owned stock in PQC.

Stock certificates were issued to the plaintiffs by February 6, 1998.