[Nos. 53738-5-I; 53739-3-I.   Division One.   October 10, 2005.]

KEVIN HELENIUS ET AL., *Appellants*, v. CRAIG CHELIUS ET AL., *Respondents*.

---

*David Lenci* (of *Preston Gates & Ellis, L.L.P.*) and *Catherine A. Drews* (of *Foster Pepper & Shefelman, P.L.L.C.*), for appellants.

*Philip E. Cutler* and *Robert G. Nylander, Jr.* (of *Cutler Nylander & Hayton, P.S.*); *Mark S. Davidson* (of *Williams Kastner & Gibbs, P.L.L.C.*); *Gary Marshall*; *Leonard J. Feldman* (of *Heller Ehrman, L.L.P.*); and *Catherine Smith* (of *Edwards Sieh Smith & Goodfriend, P.S.*), for respondents.

¶1 SCHINDLER, J. — In exchange for Questar Microsystems, Inc.'s (Questar), and its owners', H. Alan Tilley and Kevin Helenius, agreement to sell their Send.com stock, Send.com assumed the Questar liabilities identified in the December 9, 1998 Stock Purchase Agreement (SPA) and agreed to indemnify and hold harmless Questar, Helenius, and Tilley on these liabilities. One of the assumed liabilities was for wage claims of two former Questar employees, Craig Chelius and Adam Feuer. When Send.com refused to indemnify Questar, Helenius, and Tilley on Chelius and Feuer's May 2000 judgment, Questar, Helenius, and Tilley sued Send.com for specific performance and breach of the SPA. After learning about an agreement between Send.com and Chelius and Feuer to prevent Questar, Helenius, and Tilley from enforcing their rights to indemnification under the SPA, they amended their complaint naming the Send.com directors and Chelius and Feuer as defendants and asserted claims for violation of the Washington State Securities Act (WSSA), chapter 21.20 RCW, abuse of process and tortious interference.

¶2 In a detailed and lengthy memorandum decision, the trial court ruled that Send.com breached the SPA; that Send.com and the Send.com directors' intentional misrepresentations about settlement of Chelius and Feuer's wage claim and the agreement between Send.com and Chelius

and Feuer violated the WSSA; and that Chelius and Feuer were liable for tortious interference and abuse of process. The court awarded Questar approximately $277,000 for Send.com's breach of the SPA. The award included $147,000 owed to Helenius and Tilley and the attorney fees incurred by Questar, Helenius, and Tilley in the Chelius and Feuer wage claim lawsuit. As a remedy for Send.com and the Send.com directors' violation of the WSSA, the trial court ordered rescission of Helenius and Tilley's SPA stock sale; enjoined enforcement of Chelius and Feuer's judgment against Questar, Helenius, and Tilley; and awarded attorney fees. For Chelius and Feuer's tortious interference with the SPA and abuse of process, the court awarded Helenius and Tilley nominal damages but ruled that Chelius and Feuer's judgment was void. Helenius and Tilley, Send.com directors Brian DiJulio, Paul Brogan, Randall Burke, and Roger McCracken, and former Questar employees Chelius and Feuer, appeal. We affirm the trial court's decision.

## FACTS

¶3 In 1979, Tilley founded Questar, a company that manufactured electronic and computer devices for use as industrial controls. Questar was a moderately successful company with 20 employees and annual revenues of approximately $1.3 million. In 1994, Helenius joined Questar as CEO and became a co-owner.

¶4 In the mid-1990s, Helenius and Tilley decided to develop the technology for an electronic document delivery system for business documents. To raise capital to develop the Internet Document Delivery System (IDD), Helenius and Tilley sold some of their Questar stock to private investors, including Brian DiJulio, a licensed securities broker, Paul Brogan, a retired Boeing Company executive, Randall Burke, who runs a family-owned electrical contracting company, and Roger McCracken, a real estate investor and property manager. In 1996 and early 1997, Questar hired

Craig Chelius and Adam Feuer to work on developing and marketing the IDD software.

¶5  By January 1998, Questar was in debt over $1 million and had virtually no operating capital. When Feuer and Chelius left in December 1997 and January 1998, Questar owed them over $170,000 in unpaid wages. At the time, Chelius offered to buy the IDD software for $600,000 but Helenius and Tilley believed the IDD software was worth much more and rejected Chelius' offer. In the spring of 1998, Chelius and Feuer sued Questar, Helenius, and Tilley for the unpaid wages Questar owed them.

¶6  In early 1998, in an attempt to attract more investors, Helenius and Tilley restructured Questar and incorporated two wholly-owned subsidiaries, Westar and Send.com. Questar's industrial controls business assets were transferred to Westar. Questar's IDD software was transferred to Send.com subject to a "Source License Agreement."[1] Under the Source License Agreement, Questar gave Helenius and Tilley a nonexclusive license to use the IDD software. After Questar's assets were transferred to Westar and Send.com, Questar was left with approximately $1 million in liabilities and virtually no assets.

¶7  The Questar reorganization was approved at a shareholder meeting in June 1998. The minority shareholders exchanged their Questar stock for Send.com stock, one-for-one. Helenius and Tilley exchanged 80 percent of their Questar stock and received one share of Send.com for each two Questar shares. The reorganization resulted in Helenius and Tilley owning 100 percent of Questar and effectively controlling Send.com through their 40 percent ownership of Send.com stock and Questar's 21 percent ownership of Send.com stock. The Send.com board of directors (Board) consisted of DiJulio, Helenius, and McCracken. DiJulio was also the president of Send.com.

---

[1] Clerk's Papers (CP) at 463.

¶8 After Send.com was incorporated, it attracted interest from investors and the Board explored alternatives for developing and marketing the IDD software.[2] DiJulio located a Texas software company, Instant Documents, that was interested in acquiring Send.com's IDD software.[3] In June 1998, DiJulio began negotiations with Instant Documents. After negotiations with Instant Documents fell through, DiJulio decided he wanted to acquire the IDD software for his own company, Instant Courier.[4]

¶9 In September 1998, DiJulio resigned from the Send.com Board to negotiate with Send.com on behalf of his company, Instant Courier.[5] Two critical issues discussed during the negotiations with DiJulio were Questar's liabilities and the IDD license retained by Helenius and Tilley. Creditors who had waited during the Instant Document negotiations were pressing their claims and seeking payment. DiJulio agreed to assume Questar's liabilities in exchange for acquiring IDD software. DiJulio also assumed responsibility to negotiate a settlement of Chelius and Feuer's wage claim lawsuit against Questar. In October 1998, DiJulio told Helenius that Chelius and Feuer agreed to settle the wage claim lawsuit.

¶10 In November 1998, the relationship between Helenius, DiJulio, and the Send.com directors soured, in part because Helenius was unwilling to relinquish his license for the IDD software to facilitate a deal with DiJulio's company. Helenius resigned from the Send.com board. Negotiations with DiJulio's company, Instant Courier, were abandoned, and Send.com hired DiJulio to oversee the IDD project. Send.com then entered into negotiations to buy out Questar's, Helenius', and Tilley's interests in Send.com and assume Questar's liabilities.

[2] Questar sold Westar, along with $250,000-$300,000 of Questar's liabilities for which Helenius and Tilley were also personally liable, to a third party.

[3] CP at 465.

[4] CP at 467.

[5] Brogan was elected to replace DiJulio on the board of directors.

¶11 On December 9, 1998, Send.com and Questar, Helenius, and Tilley entered into an SPA. In exchange for Questar's, Helenius', and Tilley's Send.com stock, Send.com agreed to assume responsibility for certain Questar liabilities that were listed and identified in exhibit A of the SPA.[6] Send.com agreed to indemnify and hold harmless Questar, Helenius, and Tilley from the liabilities in exhibit A and pay Helenius and Tilley $100,000. Under the SPA, Send.com assumed over $1 million in Questar liabilities.

¶12 One of the liabilities identified in exhibit A of the SPA was Chelius' and Feuer's $173,000 wage claims. Another liability identified was $147,000 owed to Tilley and Helenius. Send.com agreed in the SPA to pay the amount owed Helenius and Tilley pro rata with the other assumed liabilities. The SPA also specifically refers to the already negotiated settlement of Chelius' and Feuer's wage claims:

> (2) Purchaser will pay the $147,900 Assumed Liability payable to Alan Tilley and Kevin Helenius either (a) pro-rata with all Assumed Liabilities exclusive of those settlements already negotiated and undisputed unpaid claims of former Questar hourly employees, or (b) pursuant to a mutually agreed monthly installment agreement.[7]

¶13 Despite DiJulio's repeated assurances that Chelius and Feuer had agreed to settle their wage claims, no settlement agreement was executed and the lawsuit against Questar, Helenius, and Tilley proceeded to trial in fall 1999. The trial court found in favor of Chelius and Feuer and in May 2000, entered judgment against Questar, Helenius, and Tilley for $508,932.24.

¶14 Unbeknownst to Helenius and Tilley, by May 2000, Chelius and Feuer and Send.com had entered into an agreement to prevent Questar, Helenius, and Tilley from enforcing their rights under the SPA. Chelius and Feuer promised not to execute their wage claim judgment against

---

[6] Together with the SPA, Send.com and Questar executed a "Pledge and Escrow Agreement." The parties agreed Questar's stock would be held in escrow until Send.com paid the liabilities identified in exhibit A.

[7] Ex. 1, at 2.

Send.com. Instead, they agreed to execute the judgment at Send.com's request against any legal action Questar, Helenius, or Tilley filed against Send.com. In January 2001, Chelius and Feuer and Send.com formally executed the agreement.[8]

¶15 In 2001, this court affirmed the trial court's decision in favor of Chelius and Feuer and the wage claim judgment against Questar, Helenius, and Tilley.[9] Thereafter, Questar, Helenius, and Tilley sought indemnification for Chelius and Feuer's judgment against them from Send.com. In a letter from the board of directors, Send.com told Questar, Helenius, and Tilley it had already entered into a settlement agreement with Chelius and Feuer and would not indemnify them. Send.com refused to provide a copy of their agreement to Questar, Helenius, and Tilley.

¶16 In November 2001, Questar, Helenius, and Tilley sued Send.com for breach of the SPA. In February 2002, Chelius and Feuer filed a writ of execution for the wage claim judgment against "[a]ll claims of Questar Microsystems, Inc. against Send.com, Inc. asserted and pending in the case of *Questar Microsystems, Inc. vs. Send.com, Inc.,* King County Superior Court, Cause No. 01-2-27468-6 SEA."[10] During discovery, Questar, Helenius, and Tilley obtained a copy of the agreement between Chelius and Feuer and Send.com. Questar, Helenius, and Tilley then filed an amended complaint alleging Send.com and its directors were liable for violation of the WSSA; Send.com and its directors and Chelius and Feuer were liable for abuse of process; and Send.com's directors and Chelius and Feuer were liable for tortious interference with the SPA.

¶17 The trial court ruled Send.com breached the SPA; Send.com and Send.com's directors Brian DiJulio, Paul Brogan, Randall Burke, and Roger McCracken (the

---

[8] Ex. 3.

[9] *Chelius v. Questar Microsystems, Inc.*, 107 Wn. App. 678, 27 P.3d 681 (2001).

[10] CP at 1710. The writ was stayed on May 1, 2002.

Send.com directors) violated the WSSA;[11] and Chelius and Feuer were liable for tortious interference with the SPA and abuse of process. Questar elected breach of contract damages from Send.com. Helenius and Tilley relinquished their claims for breach of contract damages and requested relief against Send.com and the Send.com directors under the WSSA. The court awarded Questar approximately $130,000 for the attorney fees and costs incurred by Questar, Helenius, and Tilley in the litigation with Chelius and Feuer and the $147,900 liability identified in the SPA that was owed to Helenius and Tilley. As a remedy for Send.com and the Send.com directors' WSSA violation, the trial court ordered rescission of the SPA stock transfer and voided Chelius and Feuer's judgment. Send.com returned the stock to Helenius and Tilley, and Helenius and Tilley returned the $100,000 they received under the SPA to Send.com. The trial court awarded nominal monetary damages for Chelius and Feuer's tortious interference with the SPA and abuse of process, but declared the $508,932.24 wage claim judgment against Questar, Helenius, and Tilley null and void.

¶18 Helenius and Tilley appeal the trial court's decision that rescission was the appropriate remedy for the Send.com directors' WSSA violation. Helenius and Tilley also challenge the trial court's award of nominal monetary damages for Chelius and Feuer's tortious interference and abuse of process. The Send.com directors cross-appeal the trial court's finding that the pre-SPA misrepresentations regarding a settlement with Chelius and Feuer and their post-SPA misrepresentations and conduct violated the WSSA. Chelius and Feuer challenge the trial court's decision that they are liable for tortious interference and abuse of process. Chelius and Feuer also contend the trial court did not have the authority to void their wage claim judgment.

---

[11] Questar, Helenius, and Tilley also asserted claims against Send.com directors Jeffrey Tillman, Bruce Glant, and Steve Henn, but the claims against Tillman, Glant, and Henn were dismissed with prejudice and are not at issue on appeal.

## ANALYSIS

Washington State Securities Act

*RCW 21.20.430 Civil Remedy*

¶19 Helenius and Tilley contend the trial court erred in construing RCW 21.20.430(2) and ordering rescission of Helenius' and Tilley's SPA stock transfer as a remedy for the Send.com directors' WSSA violation. Helenius and Tilley claim they are entitled to damages under RCW 21.20.430(2).

¶20 RCW 21.20.430(2) provides:

> Any person who buys a security in violation of the provisions of RCW 21.20.010 is liable to the person selling the security to him or her, who may sue either at law or in equity *to recover the security*, together with any income received on the security, upon tender of the consideration received, costs, and reasonable attorneys' fees, *or if the security cannot be recovered, for damages*. Damages are the value of the security when the buyer disposed of it, and any income received on the security, less the consideration received for the security, plus interest at eight percent per annum from the date of disposition, costs, and reasonable attorneys' fees.

(Emphasis added.)

¶21 Statutory interpretation is subject to de novo review. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 443, 842 P.2d 956 (1993). In construing a statute, this court's primary objective is to ascertain the intent of the legislature. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 813, 828 P.2d 549 (1992). If a statute is clear on its face, its meaning is derived from the language of the statute alone. *Cockle v. Dep't of Labor & Indus.*, 142 Wn.2d 801, 807, 16 P.3d 583 (2001). When a statute is ambiguous, courts construe the statutory language to effectuate the intent of the legislature. *Cockle*, 142 Wn.2d at 821-22. A statute is ambiguous if it can be reasonably interpreted in more than one way. *Cockle*, 142 Wn.2d at 808

(citing *Harmon v. Dep't of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998)).

¶22 The WSSA is a remedial statute. *Go2net, Inc. v. Freeyellow.com, Inc.*, 126 Wn. App. 769, 775, 109 P.3d 875 (2005). Its primary purpose is to protect investors from speculative or fraudulent schemes of promoters. *Id.* (citing *Cellular Eng'g, Ltd. v. O'Neill*, 118 Wn.2d 16, 23-24, 820 P.2d 941 (1991)). Our courts construe the WSSA broadly to effectuate its intent. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 125-26, 744 P.2d 1032 (1987). A plaintiff's civil remedy under the WSSA is different and in some ways more restrictive than a plaintiff's choice of remedies at common law. *Kittilson v. Ford*, 23 Wn. App. 402, 407, 595 P.2d 944 (1979).[12]

¶23 The unambiguous language of RCW 21-.20.430(2) provides that a defrauded seller may sue for rescission to recover the security, and only if rescission is not possible (because the securities cannot be recovered) can a defrauded seller seek to obtain damages. RCW 21-.20.430(2) states that a defrauded seller "may sue either at law or in equity to recover the security . . . or if the security cannot be recovered, for damages." Under RCW 21-.20.430(2), money damages are available only if the security cannot be recovered; in all other cases, rescission is the applicable remedy.

¶24 Helenius and Tilley acknowledge that under one interpretation of the statute, rescission is the appropriate remedy if the purchaser still has the securities or is able to obtain them. But they assert that RCW 21.20.430(2) is ambiguous because the statute can also be interpreted to provide damages when the purchaser has disposed of the securities. Helenius and Tilley argue their interpretation better effectuates the legislature's intent to protect investors.

---

[12] For example, unlike common law remedies for fraud, under the WSSA a defrauded purchaser is not allowed to keep the security and recover damages. *Kittilson*, 23 Wn. App. at 407.

¶25 Helenius and Tilley interpret the language of the statute to mean that a seller may sue to recover the security or, at the seller's option, to obtain damages. But RCW 21-.20.430(2) does not provide for an election of remedies. RCW 21.20.430(2) provides only for damages where the securities "cannot be recovered." To support their interpretation, Helenius and Tilley rely on the internal structure of the statute and the phrase in the second sentence of RCW 21-.20.430(2): "Damages are *the value of the security when the buyer disposed of it . . . .*" (Emphasis added.) Helenius and Tilley's interpretation ignores the purpose of the first and second sentences in RCW 21.20.430(2). The first sentence defines what remedies are available to a defrauded seller under the WSSA and when those remedies apply. The second sentence defines how damages are calculated; it does not define when damages are available.

¶26 Helenius and Tilley assert that limiting the availability of damages to those situations where a fraudulent purchaser cannot recover securities that have been disposed of is inconsistent with the legislature's intent. Helenius and Tilley claim that, unlike the rescissory remedy for a defrauded seller under RCW 21.20.430(1), RCW 21-.20.430(2) is designed to allow a defrauded seller to obtain any benefit the fraudulent purchaser obtained. Helenius and Tilley go to great lengths to explain why a disgorgement remedy is better than rescission for a defrauded seller under RCW 21.20.430(2). Their argument misses the point. Whether one remedy is better than another does not answer the question of whether that remedy was authorized by the legislature in the statute.

¶27 While we must construe the WSSA liberally to effectuate the legislature's intent to protect investors, Helenius and Tilley are asking this court to impermissibly ignore the plain language of the statute and rewrite it. *See Millay v. Cam*, 135 Wn.2d 193, 203, 955 P.2d 791 (1998) ("Courts do not amend statutes by judicial construction, nor rewrite statutes 'to avoid difficulties in construing and

applying them.' " (citation omitted) (quoting *Applied Indus. Materials Corp. v. Melton*, 74 Wn. App. 73, 79, 872 P.2d 87 (1994))). As the court said in *State v. Groom*:

> [H]owever much members of this court may think that a statute should be rewritten, it is imperative that we not rewrite statutes to express what we think the law should be. We simply have no such authority. This is true even if the results appear unduly harsh.

133 Wn.2d 679, 689, 947 P.2d 240 (1997) (citations omitted).

¶28  Other states and the Uniform Securities Act permit defrauded sellers to elect to recover damages as an alternative to rescission. *See* IDAHO CODE ANN. § 30-14-509(c)(1); MO. ANN. STAT. § 409.5-509(c)(1); OKLA. STAT. ANN. TITLE 71, § 1-509(C)(1); OR. REV. STAT. § 59.127(2); UNIF. SEC. ACT § 509(c)(1) (2002) ("The seller may maintain an action to recover the security, and any income received on the security, costs, and reasonable attorneys' fees determined by the court, upon the tender of the purchase price, or for actual damages . . . ."). RCW 21.20.430(2) contains no comparable provision.

¶29  Still other states provide that a seller can obtain damages if the purchaser no longer owns the security. *See* N.J. STAT. ANN. § 49:3-71(c); MD. CODE ANN., CORPS. & ASS'NS § 11-703(b)(2); N.M. STAT. ANN. § 58-13B-40(C); N.C. GEN. STAT. § 78A-56(b); TEX. REV. CIV. STAT. ANN. art. 581, § 33(B); WIS. STAT. ANN. § 551.59(2)(a). Unlike those states' statutes, RCW 21.20.430(2) focuses on whether the security can be recovered, not on who owns it.[13]

¶30  Under RCW 21.20.430(2), whether rescission is the applicable remedy depends on whether the securities can be

---

[13] Helenius and Tilley also rely on federal cases interpreting 17 C.F.R. § 240.10b-5 (Rule 10b(5)) to argue that a defrauded seller is entitled to the greater of his loss or the fraudulent purchaser's profit. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972); *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir. 1978). But as the court acknowledged in *Nelson*, there is no express enumeration of remedies under Rule 10b(5). Thus, federal law is not helpful in interpreting what remedies are available under RCW 21.20.430(2).

recovered. This determination is a question of fact. *Guarino v. Interactive Objects, Inc.*, 122 Wn. App. 95, 132, 86 P.3d 1175 (2004) ("Whether rescission is possible [under RCW 21-.20.430(2)] requires a factual determination by the trial court that the securities in question are available."). The Send.com stock Questar, Helenius, and Tilley sold to Send.com under the terms of the SPA was reissued to Send.com directors and employees shortly after the SPA was executed. This stock was tendered back to Send.com before entry of the judgment. The trial court found that the Send.com stock Helenius and Tilley sold to Send.com in the SPA could be recovered, and rescission was the appropriate remedy under RCW 21.20.430(2). Substantial evidence supports the trial court's finding. We will uphold a finding of fact if it is supported by substantial evidence. *Miller v. City of Tacoma*, 138 Wn.2d 318, 323, 979 P.2d 429 (1999).[14]

¶31 Even if RCW 21.20.430(2) is not ambiguous, Helenius and Tilley contend this court must construe the statute to prohibit a fraudulent purchaser from recovering shares he has disposed of in order to effectuate legislative intent and avoid an absurd result. A court should avoid a strained or absurd result in interpreting a statute. *See Cherry v. Mun. of Metro. Seattle*, 116 Wn.2d 794, 802, 808 P.2d 746 (1991). Helenius and Tilley argue Send.com had significant worth when they transferred their stock, and the Send.com directors fraudulently took control of Send.com and proceeded to ruin the company and make the stock worthless. But this argument is expressly contradicted by the trial court's findings. The court found Helenius and Tilley never made Send.com a financial success, and an award of damages based on the book value of the shares at the time of the SPA "would amount to an unwarranted windfall."[15] Furthermore, the primary injury Helenius and Tilley alleged they suffered was the inability to name Send.com as a third party defendant and entry of

---

[14] Substantial evidence exists when the evidence in the record is of sufficient quantity to persuade a fair-minded, rational person of the truth of the finding. *Miller*, 138 Wn.2d at 323.

[15] CP at 500.

Chelius and Feuer's $508,932.24 wage claim judgment against them. The trial court declared Chelius and Feuer's judgment against Questar, Helenius, and Tilley null and void to address this injury.

> Under the SPA, Tilley and Helenius have received the $100,000 cash consideration for their Send.com stock, but Questar has not received the consideration it bargained for which was for [Send.com] to pay the Assumed Liabilities and to indemnify, defend and hold Plaintiffs harmless. By enjoining further attempts to execute on the Chelius-Feuer judgment, and issuing declaratory relief that voids the judgment, the Plaintiffs will effectively have been restored to having received the "consideration paid for the security" under the SPA. The only alternative to this equitable relief which Plaintiffs have sought is an award of damages for several million dollars based upon the "book value" used by Send.com to account for its stock. However, those values of between $1.25-$2.50 per share have never been established as market value for Send.com's stock. The award of such damages would amount to an unwarranted windfall to the Plaintiffs who never made Send.com such a financial success during their tenure and who agreed to convey their stock based upon comparatively nominal cash and for assumption of liabilities. Since they have already been paid their $100,000 cash, the balance of the consideration they lost can best be realized by awarding them equitable relief which has the same effect as enforcement of the SPA.[16]

¶32 On this record, the trial court's decision to order rescission as the appropriate remedy under RCW 21-.20.430(2) did not violate the intent of the WSSA.

*WSSA Violation*

¶33 In their cross appeal, the Send.com directors claim the trial court erred in deciding they violated the WSSA based on pre-SPA misrepresentations that Chelius' and Feuer's wage claims were settled and post-SPA misrepresentations about settlement and the agreement to prevent

---

[16] CP at 500. In addition, Questar was awarded attorney fees and costs for defending the wage claim lawsuit as a remedy for Send.com's breach of the SPA.

Questar, Helenius, and Tilley from enforcing their rights under the SPA. We disagree.

¶34 Questar's liabilities were an ongoing subject of concern and discussion during the Instant Documents and Instant Courier negotiations. In October 1998, DiJulio told Helenius "we have a deal" to settle Chelius and Feuer's wage claim lawsuit.[17] Send.com's November 1998 cash flow projections also reflected the terms of the settlement, with scheduled monthly payments to Chelius and Feuer. During negotiations for the SPA, Helenius again made it clear to DiJulio and McCracken that his primary objective in entering into the SPA was to protect Questar, Tilley, and himself from Questar's liabilities. Before Questar, Helenius, and Tilley signed the SPA in December 1998, Helenius sent DiJulio a written settlement proposal for the wage claim lawsuit containing the terms of the settlement as described by DiJulio. Chelius' and Feuer's wage claims were specifically identified in exhibit A to the SPA as a liability that Send.com agreed to assume and to indemnify Questar, Helenius, and Tilley by holding them harmless. But by January 1999, Send.com decided not to honor its obligations under the SPA. The trial court found:

> Send.com had determined not to honor its obligations to [Questar, Helenius, and Tilley] under the SPA by the end of January 1999, thirty days after [Questar, Helenius, and Tilley] had provided Send.com with a settlement agreement for the Chelius-Feuer claims for the second time.[18]

¶35 The trial court also found that while Helenius did not know whether the settlement negotiated by DiJulio had been signed when Questar, Helenius, and Tilley entered into the SPA, "he reasonably believed that under the SPA

---

[17] CP at 469.

[18] CP at 474-75. The court also found, "[I]nstead of following up on the earlier settlement, Send.com instead began to make new offers of stock only to Chelius which were preordained to be unacceptable." CP at 475. The Send.com directors have not assigned error to these findings and they are therefore considered verities on appeal. *Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 792, 98 P.3d 1264 (2004).

Send.com had assumed that liability, and that if the settlement was not yet finalized, it would be expeditiously."[19] The court also found that Helenius and Tilley relied on Send.com's continuing false representations and deceptive conduct after entering into the SPA. "In the period after the SPA and before the Chelius-Feuer trial in August 1999, Helenius and Tilley relied on Send.com's continued false representations and reassurances that settlement of the Chelius and Feuer claims was imminent."[20] As a result of their reasonable reliance on Send.com's representations, Helenius and Tilley did not name Send.com as a third-party defendant and they were unprepared for trial. The trial court also found that the May 2000 agreement between Chelius and Feuer and Send.com and the January 2001 written agreement were a scheme to prevent Questar, Helenius, and Tilley from receiving the consideration promised by Send.com to induce them to sell their Send.com stock.

¶36 The trial court concluded Send.com's misrepresentations regarding settlement with Chelius and Feuer before the SPA was executed, false assurances that settlement was imminent after the SPA was executed but before trial in the wage claim lawsuit, and the scheme to prevent Questar, Helenius, and Tilley from enforcing their rights under the SPA were made in connection with the purchase of securities and violated RCW 21.20.010. Based on the pre- and post-SPA misrepresentations and conduct, the trial court ruled Send.com and the Send.com directors were liable for violating the WSSA.[21]

¶37 Relying on the integration clause in the SPA, the Send.com directors contend that as a matter of law Helenius and Tilley could not have reasonably relied on the

---

[19] CP at 475.

[20] CP at 476.

[21] Although DiJulio was technically not on the Send.com board of directors when he made the pre-SPA representations regarding a settlement with Chelius and Feuer, the trial court found he was a "control person" over Send.com under RCW 21.20.430 and imposed liability against him on that basis.

pre-SPA representations about a settlement with Chelius and Feuer. In the alternative, the Send.com directors contend the trial court's finding that Helenius and Tilley reasonably relied on the pre-SPA representations regarding a settlement is not supported by substantial evidence. The Send.com directors also claim the trial court erred in relying on *Ohashi v. Verit Industries*, 536 F.2d 849 (9th Cir. 1976), and *Davis v. Davis*, 526 F.2d 1286 (5th Cir. 1976), to conclude their post-SPA conduct gave rise to liability under the WSSA. They argue that misrepresentations and conduct after the sale were not related to the SPA and could not have caused Helenius and Tilley to enter into the SPA and sell their stock.

*Integration Clause*

■ ¶38 The Send.com directors rely on this court's decision in *Stewart v. Estate of Steiner*, 122 Wn. App. 258, 93 P.3d 919 (2004), *review denied*, 153 Wn.2d 1022 (2005), to argue the SPA integration clause is a "non-reliance" clause that as a matter of law precludes Helenius and Tilley from relying on the pre-SPA representations.[22]

¶39 In *Stewart*, this court held that a purchaser of securities was unable to establish reasonable reliance based on a seller's oral misrepresentations or omissions because the subscription agreement provided that the pur-

---

[22] As a preliminary issue, Helenius and Tilley argue that this argument was not properly raised below and therefore cannot be raised on appeal. But the Send.com directors made this argument in their motion for reconsideration before judgment was entered and the argument raises only a question of law and does not depend on new facts. *See Anderson v. Farmers Ins. Co.*, 83 Wn. App. 725, 734, 923 P.2d 713 (1996) (Where an issue does not depend on new facts and is closely related to an issue already raised, it may be raised in a motion for reconsideration.). Additionally, whether this clause in the SPA barred Helenius' and Tilley's reasonable reliance on pre-SPA statements as a matter of law is not an avoidance of or affirmative defense to Helenius and Tilley's WSSA claim. Instead, it is a matter that would controvert Helenius and Tilley's prima facie claim of reasonable reliance on a misrepresentation. *See Sprague v. Sumitomo Forestry Co.*, 104 Wn.2d 751, 757, 709 P.2d 1200 (1985) (Where notice of intent to resell is part of the plaintiff's prima facie claim to recover resale price differential after a breach of contract, lack of notice need not be affirmatively denied.); *Harting v. Barton*, 101 Wn. App. 954, 962, 6 P.3d 91 (2000) (Any matter that does not tend to controvert the opposing party's prima facie case should be pleaded as an affirmative defense.).

chaser " 'has relied solely on the information contained in the Memorandum,' " and he " 'has not relied on any oral representation, warranty or information in connection with the offering of Shares by the Company, or any . . . agent . . . of the Company." *Stewart*, 122 Wn. App. at 266-67 (emphasis omitted). The memorandum that accompanied the subscription agreement in *Stewart* stated that:

> No general solicitation will be conducted and no offering literature or advertising in any form will or may be employed . . . except for this Memorandum (including amendments and supplements to this Memorandum) and the documents summarized herein or enclosed herewith. No person is authorized to give any information or to make any representation not contained in this Memorandum (including amendments and supplements to this Memorandum) or in the documents summarized herein or enclosed herewith and, if given or made, such other information or representation must not be relied upon.

*Stewart*, 122 Wn. App. at 267-68 (original in all caps).

■■ ¶40 Unlike the provisions in the agreement in *Stewart*, the SPA does not explicitly address "reliance." The integration clause in the SPA states:

> **Complete Agreement.** This Agreement (together with the documents and exhibits referred to herein) sets forth the entire understanding of the parties hereto with respect to the matters provided for herein and supersedes all prior agreements, covenants, arrangements, understandings, communications, undertakings, representations or warranties, whether oral or written, by any officer, representative shareholder, agent or employee of any party.[23]

In addition, the SPA does not explicitly limit a party's reliance on the other party's representations and expressly contemplates Send.com's liability for the settlement of Chelius' and Feuer's wage claims. The SPA explicitly states that Send.com will indemnify Questar, Helenius, and Tilley

---

[23] Ex. 1, at 13, ¶ 10(J).

for certain Questar liabilities, including the Chelius and Feuer wage claims.[24] The SPA also refers to assuming liability for "those settlements already negotiated."[25]

¶41 The Send.com directors also rely on two federal cases, *One-O-One Enterprises, Inc. v. Caruso*, 848 F.2d 1283 (D.C. Cir. 1988), and *Jackvony v. Riht Financial Corp.*, 873 F.2d 411 (1st Cir. 1989), to support their argument that Helenius and Tilley could not reasonably rely on the directors' pre-SPA misrepresentations about settlement. But while the contracts in *One-O-One* and *Jackvony* are more like the integration clause in the SPA than the nonreliance clause in *Stewart*, both *One-O-One* and *Jackvony* are factually distinguishable.

¶42 In *One-O-One*, the court held that an integration clause in a contract that included the sale of securities prevented reasonable reliance on prior representations in an earlier version of the contract because those representations were eliminated from the final, signed version of the contract. Here, Helenius and Tilley do not rely on a representation from a prior version of the SPA.

¶43 In *Jackvony*, the court set forth eight factors a court should consider to determine whether a party reasonably relies on a representation. These factors include:

> "(1) [t]he sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations."

*Jackvony*, 873 F.2d at 416 (quoting *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987)). The *Jackvony* court concluded the investor could not reasonably rely on alleged misrepresentations where the written agreement

---

[24] *See* Ex. 1, at 10; Ex. A.

[25] *See* Ex. 1, at 2.

expressly stated it superseded all previous written and oral understandings.

¶44 In *Stewart*, this court adopted the *Jackvony* factors to decide whether reliance is reasonable and held that a nonreliance clause does not as a matter of law necessarily preclude reasonable reliance. *Stewart*, 122 Wn. App. at 274.[26] Here, we conclude that the integration clause in the SPA did not preclude Helenius' and Tilley's reasonable reliance on representations regarding settlement of Chelius' and Feuer's claims as a matter of law.[27]

¶45 The Send.com directors argue that even if the integration clause in the SPA did not as a matter of law preclude Helenius and Tilley from reasonably relying on misrepresentations regarding the settlement of Chelius' and Feuer's claims, the trial court's findings did not take

---

[26] Moreover, this court in *Stewart* relied on *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000), a more recent federal case relying on both *One-O-One* and *Jackvony*. The court in *Rissman* considered a nonreliance provision that was even more explicit than that at issue in *Stewart*. *See Rissman*, 213 F.3d at 383 (Seller was not able to rely on an oral representation by the purchaser that he would not sell the company where the purchaser explicitly refused to put that representation in a written stock purchase agreement, the written agreement explicitly provided the seller with a remedy if the purchaser sold the company, and the agreement included two explicit nonreliance provisions.). In a concurrence that was cited favorably by this court in *Stewart*, one of the judges in *Rissman* emphasized, "all circumstances surrounding the transaction are relevant in determining whether reliance on prior oral statements can be deemed reasonable," and "the existence of a nonreliance clause will not automatically preclude damages for prior oral statements." *Rissman*, 213 F.3d at 387-88 (Rovner, J., concurring).

[27] The additional federal and out-of-state cases the Send.com directors cite in their reply brief do not support a different result. *See Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, 316 F.3d 641 (7th Cir. 2002) (reciting general rule that an integration clause does not preclude a fraud claim based on oral misrepresentations; reversal of jury's finding of reasonable reliance was based on plaintiffs' apparently purposeful ignorance of contradictory facts); *Emergent Capital Inv. Mgmt. L.L.C. v. Stonepath Group, Inc.*, 165 F. Supp. 2d 615 (S.D.N.Y. 2001) (using same factors as listed in *Jackvony* to analyze whether reliance was reasonable); *First Data POS, Inc. v. Willis*, 273 Ga. 792, 546 S.E.2d 781 (2001) (in addition to integration clause, stock purchase agreement explicitly contradicted the oral representation the party wished to rely on); *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 682 N.E.2d 118, 224 Ill. Dec. 557 (1997) (does not involve the sale of securities, so the liberal interpretation of securities laws to protect investors, cited by this court in *Stewart* in connection with the importance of considering factors in addition to a nonreliance clause, does not apply; criticized by and contrary authority cited in *Vigortone*).

into consideration the *Jackvony* factors and are not supported by substantial evidence.

¶46 To support their argument, the Send.com directors rely primarily on Helenius' sophistication and experience in financial matters, including the fact that he is an attorney, he engaged in prior securities transactions, and he negotiated and drafted the SPA. But the trial court took into consideration Helenius' background and experience in deciding whether his reliance was reasonable.[28] And in the SPA, Send.com expressly agreed to indemnify Questar, Helenius, and Tilley for Chelius' and Feuer's wage claims. And as the trial court pointed out, the SPA refers to " 'those settlements already negotiated.' "[29]

¶47 The Send.com directors also contend that the arm's-length and adversarial relationship between Helenius and the Send.com directors, the lack of a fiduciary relationship, and the fact that Questar, Helenius, and Tilley were parties to the wage claim suit show it was not reasonable for Helenius to rely on DiJulio's representations regarding a settlement.[30] They also claim that DiJulio's representations were "exceedingly general."[31] DiJulio assumed responsibility to settle Chelius' and Feuer's wage claims

---

[28] *See* Mem. Decision, CP at 459, 461-62, 471-74.

[29] CP at 475 (quoting Ex. 1, at 2).

[30] *See Stewart* factors (2), (3), (4), and (6). The Send.com directors also claim "there was no allegation, evidence, or finding that [they] concealed any information from [Helenius, Tilley, and Questar]." Br. of Defs./Resp'ts'/Cross Appellants Brogan et al. at 20 [hereinafter Directors' Br.]. *See Stewart* factor (5). But the trial court found that DiJulio misrepresented the status of the settlement of Chelius' and Feuer's claims to Helenius before the SPA. To the extent that this misrepresentation can be characterized as something other than concealment, DiJulio's role as the primary negotiator, with Chelius and Chelius' statement that he wanted the payment for his settlement to come from someone other than Questar and Helenius because he did not trust Helenius to make the payments, would have contributed to keep Helenius "out of the loop" on the true status of the settlement. *See* CP at 475. Although not directly relevant to whether Helenius reasonably relied on the pre-SPA representations for purposes of a WSSA claim, it is clear (and the trial court found) that by January 1999, the Send.com directors intended not to honor their obligations under the SPA and concealed their ongoing conversations with Chelius and Feuer from 1999 through the signing of the agreement in January 2001 and despite Helenius and Tilley's tender of the wage claim judgment to Send.com for indemnification in fall 2001.

[31] *See Stewart* factor (8); Directors' Br. at 20.

because he wanted to resolve the pending suit against Questar to facilitate his business deal. While the relationship between Helenius and the Send.com directors was deteriorating in the fall of 1998, Helenius had worked with DiJulio since 1996, and Helenius was still on the Send.com board of directors when DiJulio told Helenius he had settled Chelius' and Feuer's wage claims in October 1998. Finally, Helenius received detailed information from DiJulio about the terms of the settlement and gave written settlement agreements to DiJulio that contained language reflecting the terms DiJulio said he had negotiated with Chelius and Feuer.[32] We conclude the trial court properly considered the *Jackvony* factors and substantial evidence supports the trial court's finding that Helenius and Tilley reasonably relied on DiJulio's misrepresentations about an agreed settlement of Chelius' and Feuer's wage claims.

*Post-SPA Conduct*

¶48 The Send.com directors contend the trial court erred in relying on the post-SPA misrepresentations and agreement with Chelius and Feuer in finding they violated the WSSA. The directors argue that under RCW 21.20.010, conduct after a stock sale is not "in connection with" the

---

[32] In their reply brief, the Send.com directors argue Helenius and Tilley relied on the indemnification provision in the SPA, not DiJulio's representations that a settlement had been reached, when they signed the SPA. But in the course of attempting to show a contradiction in the trial court's findings on this issue, the Send.com directors omit a key phrase from the court's findings. The trial court found that, "As of the SPA, Helenius did not know if the settlement negotiated by DiJulio had been signed or not, but he reasonably believed that under the SPA Send.com had assumed that liability, *and that if the settlement was not yet finalized, it would be expeditiously*." CP at 475 (emphasis added). The importance to Helenius of a settlement agreement even with the indemnification provisions in the SPA was highlighted by the trial court:

Helenius recognized that the disclosure of the SPA would cause the settlement to come unraveled. His fear was that the earlier settlement would not be honored when Chelius learned that Send.com had obligated itself to pay the $173,000 claims. . . . As things turned out, Helenius was right, but for a different reason. When the SPA was disclosed [to Chelius and Feuer pursuant to a discovery request in the wage claim litigation], it infuriated Chelius, not because Send.com assumed the liability for the $173,000 in claims, but because the SPA had provided $100,000 in cash to Helenius and Tilley which Chelius believed they should have used to pay him and Feuer.

CP at 479.

SPA and the sale of securities.[33] The Send.com directors claim that a person is liable under the WSSA only if the representations and conduct occur before the sale and cause a plaintiff to buy or sell securities.

¶49 Under RCW 21.20.010,

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

RCW 21.20.430(2) provides, in part, "Any person who buys a security in violation of the provisions of RCW 21.20.010 is liable to the person selling the security to him or her . . . ."

¶50 The question is whether conduct "in connection with" the sale or purchase of a security can include misrepresentations or conduct that occurs after entering into an agreement to sell securities. The assumption of Questar's liabilities and indemnification was a critical part of Helenius and Tilley's decision to enter into the SPA. The court found that after entering into the SPA, Send.com continued to make false statements about the status of the wage claim settlement and colluded with Chelius and Feuer to thwart Questar's, Helenius', and Tilley's attempts to obtain indemnification as promised.

¶51 The court ruled that the Send.com directors' continuing post-SPA fraudulent misrepresentations and conduct was "in connection with" the sale of securities under RCW 21.20-.010. The trial court relied on *Ohashi* and *Davis* to reach this conclusion because, as in *Ohashi* and *Davis*, Send.com's agree-

---

[33] RCW 21.20.010.

ment in the SPA to assume Questar's liabilities and provide indemnification was executory in nature and affected the unperformed part of the SPA.

¶52 In *Ohashi*, the parties exchanged stock under a corporate acquisition agreement entered into in May 1968. The stock the plaintiff received was subject to various restrictions and could not be transferred without the defendants' authorization. From December 1970 until January 1972, the plaintiff repeatedly asked the defendants to remove the stock transfer restrictions. The defendants falsely assured the plaintiff that removal was imminent and they were taking steps to make the stock transferable. The defendants' continued false assurances and delay forced the plaintiff to his detriment to agree to the removal of the restrictions on a piecemeal basis in January 1972.

¶53 The plaintiff in *Ohashi* did not contend the defendants fraudulently induced the exchange of stock but argued the fraudulent conduct was in connection with the securities transaction because the agreement was still executory when the fraud occurred. The court agreed. The court held that because the stock exchange agreement "was still executory when the fraudulent activities occurred and if those acts affected the unperformed part of the bargain, the fraud may be 'in connection with the sale or exchange of any securities.' " *Ohashi*, 536 F.2d at 853.

¶54 In the memorandum decision the trial court also analogized the Send.com settlement agreement with Chelius and Feuer to the *Davis* defendants' attempts to reduce the amount of payment for the securities. In *Davis*, the plaintiff contracted with the defendants to purchase the plaintiff's stock at a certain price. The defendants refused to honor the contracts and attempted to force the plaintiff to sell his shares for a "grossly inadequate consideration." *Davis*, 526 F.2d at 1289. The court in *Davis* held:

> Even though the alleged scheme did not arise until after the contracts to sell had been entered, we agree with the District Court that it is still "in connection with the sale." Payment has not yet been made pursuant to the contracts and the purpose of

the scheme is to reduce the amount of that payment. The alleged scheme sufficiently "touches" the contracts to sell plaintiff's securities to be "in connection with" a sale.

*Davis*, 526 F.2d at 1290 (citing *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12, 92 S. Ct. 165, 30 L. Ed. 2d 128 (1971)).

¶55 Here the trial court found:

[W]hile there was a misrepresentation regarding the status of the Chelius-Feuer settlement before the SPA, the fact that the settlement had not yet been concluded could still be remedied as shown by the December 30 transmission of a settlement agreement [from Helenius] to Send.com. However, as the trial approached later in 1999, Send.com made untrue statements that settlement was imminent when it was not because Send.com was unwilling to pay cash which it knew was required to settle the claims. Thus, this case is dissimilar to the facts in *Ohashi* (and stronger) because of the finding here that the first settlement misrepresentation predated the sale of securities; and it is similar in that further misrepresentations, untrue statements and a scheme to defraud Plaintiffs from receiving the promised consideration occurred after the sale of securities.[34]

We conclude that the trial court's ruling that "fraud occurring during the period of performance of an executory contract for the sale of securities may still be 'in connection with' the 'sale' of securities even where the misrepresentations arise after the point of sale but before the promised consideration is fully performed" is consistent with the decisions in *Ohashi* and *Davis* and the purpose of the WSSA. *Stewart*, 122 Wn. App. at 274.[35]

¶56 The Send.com directors contend *Ohashi* is factually distinguishable. They claim the investor's agreement in *Ohashi* to accept piecemeal lifting of the restrictions was a second securities sale that was coercively induced by the deceptive conduct. But the court in *Ohashi* did not rely on

[34] CP at 496-97.

[35] CP at 497.

the investor's compromise as a separate securities sale; its analysis focused solely on the defendants' continued duty to perform under the terms of the original agreement. The Send.com directors also contend *Ohashi* is distinguishable because, unlike here, the plaintiff did not file a breach of contract claim. But alleging alternate theories of relief does not affect the determination of whether there is a securities law violation.[36] Finally, the Send.com directors contend the court in *Ohashi* relied on the defendants' fraud on the market, which was not alleged or proved here. But the alleged fraud on the market is not a stated basis for the *Ohashi* court's conclusion that the deceptive conduct was "in connection with" the sale of securities.

¶57 The Send.com directors also assert *Ohashi* should not be followed because Washington courts are under no obligation to follow federal law when construing the WSSA, and the purpose of federal securities law differs from that of the WSSA. But while Washington courts are not obligated to follow federal law in construing the WSSA, Washington courts often look to federal court decisions interpreting analogous provisions of federal securities law to inform their interpretation of the WSSA. *See, e.g., Haberman*, 109 Wn.2d at 125, 130-31; *Stewart*, 122 Wn. App. at 268.[37]

---

[36] The Send.com directors contend it is unwarranted and unnecessary to impose liability under the WSSA for continuing deceptive conduct because a breach of contract or tort action would provide an adequate remedy. The WSSA is a remedial statute and its primary purpose is to protect investors from speculative or fraudulent schemes of promoters. *Cellular Eng'g, Ltd. v. O'Neill*, 118 Wn.2d 16, 23-24, 820 P.2d 941 (1991). The Send.com directors' arguments fail to explain how this purpose is promoted if investors are required to also pursue breach of contract or tort remedies for continuing deceptive conduct in connection with the sale of securities.

And the Send.com directors are mistaken when they say Helenius and Tilley obtained a judgment against Send.com for breach of contract. On the contrary, when asked to elect between a WSSA claim and a breach of contract claim, Helenius and Tilley opted for a WSSA claim and the judgment on the breach of contract claim was entered in favor of Questar alone.

[37] The court in *Haberman* recognized that the purpose of the WSSA (to protect investors) differs from the purpose of federal securities laws (to maintain the integrity of the secondary securities markets and to enforce disclosure). *Haberman*, 109 Wn.2d at 125-26. The purpose of the WSSA would be *better* served

¶58 The Send.com directors contend *Ohashi* is contrary to the weight of federal authority and should not be followed. But while each of the cases they cite recite the proposition that, in a securities fraud action, deception must induce the stock sale, none of the cases addresses executory agreements and whether deceptive acts that occur after an agreement to transfer stock is signed but before performance of the executory agreement is complete are "in connection with" the sale of securities. Nor do the cases the directors rely on address a continuing course of deceptive conduct that begins before the agreement to transfer stock and continues thereafter. *See Gurary v. Winehouse*, 235 F.3d 792 (2d Cir. 2000) (The court held an alleged misrepresentation that occurred after the first in a series of discrete stock purchases could not give rise to a cause of action under "Rule 10b-5" (the federal analogue to RCW 21.20.010)[38] because the purchase occurred before any alleged deception began and the deception could therefore not have been in connection with the purchase or sale of a security.); *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973 (10th Cir. 1996) (The failure to give a seller the name of a buyer several months after a stock sale is complete is not an actionable violation because there is no causal connection between the deceptive act or omission and the alleged injury and the failure is therefore not "in connection with" the sale.); *Craig v. First Am. Capital Res., Inc.*, 740 F. Supp. 530 (N.D. Ill. 1990) (The defendant's postsale misrepresentations that an unauthorized sale would be "reversed" did not satisfy the "in connection with" requirement of Securities Exchange Act of 1934 § 10(b)[39] because they could not be said to have caused the plaintiff's purchase of securities.). In fact, the court in *Craig* distinguished *Securities & Exchange Commission v. Holschuh*, 694 F.2d 130 (7th Cir. 1982), which held that a defendant's deceptive conduct after a securities sale was considered "in

---

by protecting investors from misrepresentations made after they enter into an agreement for the sale of stock but before the agreement is fully performed.

[38] 17 C.F.R. § 240.10b-5.

[39] 15 U.S.C. § 78j(b).

connection with" the sale because the defendant engaged in pretransaction fraudulent conduct and the posttransaction conduct provided additional evidence of the defendant's overall fraudulent scheme.[40]

¶59 The Send.com directors rely on *Haberman v. Washington Public Power Supply System*, 109 Wn.2d 107, 744 P.2d 1032 (1987), *Hines v. Data Line Systems, Inc.*, 114 Wn.2d 127, 787 P.2d 8 (1990), and *Schmidt v. Cornerstone Investment, Inc.*, 115 Wn.2d 148, 795 P.2d 1143 (1990), to argue the Washington State Supreme Court has held that defendants are liable under the WSSA only if their misrepresentations and conduct cause a plaintiff to buy or sell securities.[41] The Send.com directors' reliance on these cases is misplaced.

¶60 In *Haberman*, the court was asked to decide whether RCW 21.20.430(1) only imposes liability on the seller who passes title directly to the plaintiff or whether the statute also imposes liability on others who are a substantial factor in the offer or sale of a security. The court followed the majority of federal courts interpreting analogous federal law and concluded a "seller" under RCW 21.20.430(1) includes those whose participation in the sale was a substantial factor in causing the sale to take place. *Haberman*, 109 Wn.2d at 131. *Haberman* does not address what acts or

---

[40] The Send.com directors also cite *In re First Chicago Corp. Securities Litigation*, 789 F. Supp. 919, 923 (N.D. Ill. 1992) (reciting the general rule from *Craig* that "[t]o satisfy the 'in connection with' language of §10(b) and Rule 10b-5, a plaintiff must show a causal connection between his decision to buy or sell securities and the defendant's fraudulent conduct" (quoting *Craig*, 740 F. Supp. at 535)), and *Marcus v. Shapiro, Abramson & Schwimmer, P.A.*, 620 So. 2d 1284 (Fla. Dist. Ct. App. 1993) (The court did not reject liability based on posttransaction conduct, but rather left door open for liability if initial "sale" was revocable after material omission, and cited case where investors had to be told of postcommitment change in terms of prospectus because stock transaction was supposed to be cancelled if not fully subscribed.), but neither of these cases provides any additional support for their argument.

[41] The Send.com directors cite *Kaas v. Privette*, 12 Wn. App. 142, 529 P.2d 23 (1974), to support their assertion that causation is required. But while *Kaas* states that where a stock sale is induced by a seller's false or misleading representations, the seller is liable to the buyer, the court in *Kaas* did not consider whether a seller could be liable for representations connected with the sale that did not induce the sale agreement.

misrepresentations are "in connection with the offer, sale or purchase" of a security for purposes of RCW 21.20.010.

¶61 As in *Haberman*, the court in *Hines* did not decide whether "in connection with the offer, sale or purchase" means that fraudulent misrepresentations or conduct must cause a plaintiff to buy or sell securities to be liable under RCW 21.20.010. In *Hines*, the officers and directors accused of violating RCW 21.20.010 argued that investors were required to establish that their misrepresentations were the reason for the decline in stock value. The court rejected this argument and held that a decline in market value of stock is not an element of a WSSA claim. *Hines*, 114 Wn.2d at 134-35. The court ruled the violation was in the misrepresentation, not in how the misrepresentation affected the price of the stock. According to the court, "an investor who is wrongfully induced to purchase a security may recover his investment without any requirement of showing a decline in the value of the stock." *Hines*, 114 Wn.2d at 135.

¶62 The Send.com directors' contention that *Schmidt* is directly on point and supports their argument is also mistaken. In *Schmidt*, Zeta Corporation and its financing partner Grand Investments Company decided to buy a parcel of commercial property known as the "Bargain Boys" property. The owner was in bankruptcy; and the property was in disrepair and required extensive remodeling. Based on appraisals of $154,700 and $120,000, the bankruptcy court authorized Zeta to buy the property for $150,000. Zeta then retained another appraiser to provide market value assuming the renovations were completed. The appraiser stated in a letter that the property was valued at $460,000 "as is."

¶63 Zeta and Grand immediately arranged to sell the property to Cornerstone Investments for $200,000. Cornerstone offered to give Pacific Home Equity, Inc., a second deed of trust in exchange for $75,000. Pacific solicited the Schmidts to invest $75,000, told them their money would be used to renovate the property, and showed them the $460,000 appraisal letter. Attorney David Brink acted as an escrow agent for the sales. Brink used the Schmidts'

$75,000 for the costs incurred to close the sale. In the end only $5,000 of the Schmidts' investment was spent repairing the property. Several months later, Cornerstone defaulted and Grand foreclosed. The Schmidts sued several parties under various theories including conspiracy, fraud, and violations of the WSSA. The trial court dismissed the Schmidts' claims against the escrow agent, Brink, on a motion for directed verdict.

¶64 On appeal, the court affirmed dismissal of the Schmidts' claims against escrow agent Brink. The Send.com directors rely on the following passage from the opinion to argue that the *Schmidt* court reasoned that Brink's conduct did not cause the Schmidts' investment decision because that conduct occurred after the Schmidts purchased the securities:[42]

> At trial, no evidence was submitted which showed Brink had any contact with the appraisers, or that he was involved in marketing Bargain Boys or in soliciting [the Schmidts] to make the investment. In fact, the evidence showed Brink met [the Schmidts] for the first time many months after they made their initial investment. The trial court correctly concluded there was insufficient evidence to sustain a reasonable inference of liability on Brink's behalf for any claims other than those relating to the breach of his fiduciary duty as escrow agent/ attorney and any foreseeable emotional damage resulting from this breach. We affirm the trial court's dismissal of these claims against Brink.

*Schmidt*, 115 Wn.2d at 165. This passage does not support the Send.com directors' argument. The court in *Schmidt* did not consider whether conduct occurring after a plaintiff buys or sells securities would violate the WSSA where that conduct was related to the securities transaction because there was no evidence Brink did anything *at any time* that violated RCW 21.20.010.

¶65 We conclude that where a party engages in fraudulent misrepresentations or conduct in connection with an agreement to buy or sell securities, the agreement is

---

[42] *See* Directors' Br. at 22-23.

executory, and continuing fraudulent conduct affects the unperformed part of the agreement, a court may consider both the pre- and postagreement representations and conduct to determine whether there is a violation of RCW 21-.20.010.

¶66 Here, DiJulio made misrepresentations regarding a settlement of Chelius' and Feuer's wage claims against Questar, Helenius, and Tilley before entering into the SPA.[43] After entering into the SPA, the Send.com directors continued to misrepresent the status of a settlement for several months. The trial court concluded Send.com directors colluded with Chelius and Feuer to avoid its contractual obligations under the SPA and to deprive Questar, Helenius, and Tilley of their rights to indemnification under the SPA. According to the terms of the SPA, Send.com's duty to indemnify Helenius and Tilley continued until the assumed liabilities, including Chelius' and Feuer's wage claims, were discharged. Send.com's fraudulent scheme began before the SPA was entered into and continued afterwards while the SPA remained executory. We affirm the trial court's decision that the directors' deceptive misrepresentations and conduct before and after the SPA violated the WSSA.

¶67 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder

---

[43] The trial court found that although DiJulio was not on Send.com's board of directors from September 1998 until February 1999, he was a "control person" over Send.com under RCW 21.20.430.

[H]e participated at least as much if not more than any actual director in the negotiations for the SPA; he was the person who had more connections with other board members as he had initially solicited some of their investments; he was the single most involved person in the settlement negotiations with Chelius from October 1998 through August 1999, and responsible for the misrepresentations to Helenius regarding settlement. . . . Overall, DiJulio had more influence than most board members and he used it to significantly direct Send.com's decisions and actions in general and with regard to the negotiation and performance of the SPA in particular.

CP at 499, 655.

454

shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

KENNEDY, J.,[44] and COOK, J. PRO TEM.,[45] concur.

Reconsideration denied February 23, 2006.

Review denied at 158 Wn.2d 1026 (2007).

---

[44] Judge Faye C. Kennedy had indicated her concurrence prior to her death on September 16, 2005. *State v. Carey*, 42 Wn. App. 840, 857, 714 P.2d 708 (1986); *Honcoop v. State*, 43 Wn. App. 300, 317, 716 P.2d 963 (1986); *Gibson v. City of Auburn*, 50 Wn. App. 661, 671, 748 P.2d 673 (1988).

[45] Judge Susan K. Cook is serving as judge pro tempore of the Court of Appeals, Division One, pursuant to RCW 2.06.050.